UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED - CLERK
U.S. DISTRICT COURT

2004 APR -6  PM 4: 18

TX EASTERN-BEAUMONT

| | | |
|---|---|---|
| JENNINGS TYSON GODSY, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:04-CV-53 |
| NATIONAL BOARD OF MEDICAL | § | |
| EXAMINERS, | § | |
| Defendant. | § | |
| | § | |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION

Plaintiff, J ENNINGS T YSON G ODSY ("GODSY"), f iles t his B rief i n S upport o f

Plaintiff's Motion for Preliminary Injunction, and in support thereof, would show this Court

as follows:

### I.  Summary of Argument

Godsy has a learning disorder related to the way or rate that he processes

information that causes deficits in reading, written expression, and spelling. [Report of Dr.

Trahan, Attached as Exhibit A]  Godsy is a 4th year medical student at the University of

Texas Medical School (the "Medical School") in San Antonio, Texas, and is required to

pass the U. S. Medical Licensing Examination ("USMLE") Step 1 and Step 2 before the

end of his 4th year.  Godsy has previously applied for the Step 1 test and requested

accommodations.  The NBME denied his request and illegally refused to accommodate

Godsy's disability. Because the NBME denied his request, Godsy was required to take the

exam without accommodations and did not pass.  Godsy applied for and took the

examination a second time without accommodations and came within 3 points of passing

the exam.  Under the NBME rules, Godsy is only allowed one more opportunity to take the

Step 1 test.

Godsy requires additional time to take the tests as a reasonable accommodation of his learning disability, and by refusing to provide Godsy additional time to take the USMLE Step 1, the NBME is violating the ADA.  Since being diagnosed with a learning disability in high school, Godsy has routinely been given reasonable accommodations for testing.  With these accommodations, Godsy graduated from high school, engineering school, and is soon to complete his 4th year of medical school.

Because of the NBME's timed exam, which Godsy must pass to continue his medical training, Godsy may be forever prevented from becoming a physician.  The nature of the timed exam puts Godsy at a great disadvantage.  Godsy's learning disability with rate of information processing greatly limits him during timed exams, and does not allow him to test to his full ability.  The timed nature of the exam puts Godsy's disability to the test but not his intelligence.

Godsy's disability in rate of information processing restricts his major life activities of reading, writing, and learning, and will, if the NBME is not ordered to provide him with the reasonable accommodations that he needs, restrict his ability to work and gain employment.  As discussed by Dr. Trahan in his report, Godsy's learning disabilities do not simply put him on a performance level with people of average intelligence, but causes his performance to be lower than that of the average person in the general population. Therefore, Godsy's performance in the major life activities of reading, writing, and learning, is lower than that of the average person which qualifies him under the ADA for reasonable accommodations when taking the USMLE exams.

## II.  Factual Background

Godsy is currently in his fourth year of instruction at the University of Texas Medical School in San Antonio, Texas.  As part of the requirements to continue in his medical training, Godsy is required to pass the USMLE Step 1.  Godsy has previously applied for the exam and requested accommodations for his disability, however, the accommodations were denied.  Since the NBME denied his request for accommodations, he was required to proceed without accommodations.  On two occasions, he sat for the examination but did not pass.  On his second attempt at the exam, he missed passing the test by 3 points.  In order to continue his education, Godsy must complete both the USMLE Step 1 and Step 2 prior to the completion of his fourth year of instruction.  He cannot sit for the Step 2 test until he has successfully completed the Step 1 test.  Since he is currently in his fourth year, time is running out for Godsy and he must complete the Step 1 test soon so he will be eligible for the Step 2 test before the end of May 2004.  Currently, Godsy is in the process of applying for the Step 1 test again, and will again be requesting reasonable accommodations from the NBME.

Although his learning disabilities were not formally diagnosed until the 10th grade, Godsy's learning disabilities date back to elementary and junior high school.  Throughout high school and extending into his undergraduate work he continued to have difficulties regarding timed examinations and was granted accommodations which consisted of extra time and a separate testing room.  During college, he was able to overcome the limitations caused by his disability through accommodations from his instructors, including extra time on time limited tests.

3

After his undergraduate training in engineering, Godsy took the national engineering examination. He was granted accommodations for that examination and passed.

Upon completion of his undergraduate studies, Godsy sought admission to medical school. Upon applying to take the MCAT, Godsy applied for and was granted accommodations of extra time and a separate room. With the accommodations, Godsy received a score on the MCAT which was high enough for admission into the University of Texas Medical School in San Antonio.

Based on the results of the MCAT, achieved with an accommodation, Godsy was admitted to the Medical School. The Medical School also has provided Godsy with the reasonable accommodation of additional time on exams taken to date in medical school. With the accommodations, Godsy successfully completed the first 3 years' courses at the Medical School.

Students at the Medical School (as in many medical schools in the United States) are requested to take and pass the USMLE Step 1 before starting the third year of medical school. The third year of school consists of "rotations," i.e., medical education through the practical application of the principles learned in the classroom. The Medical School requests Step 1 be taken before the third year begins to avoid interfering with the third year studies. Passing the Step 1 is a prerequisite to completing the third year, obtaining residency admission, and being able to sit for the final Step 2 and 3 examinations.

The NBME develops and administers the USMLE Step 1 at various test sites and on various dates throughout the United States. The results of each student's scores are reported to that student's medical school.

4

The NBME recognizes the right of disabled persons to accommodations by providing an application on which examinees can request test accommodations for the USMLE Step 1, including accommodations for learning disabilities like those suffered by Godsy.

Anticipating the completion of his second year of medical school, Godsy made application to take the USMLE Step. Godsy requested a test accommodation based on his disability. The request for accommodation was supported by the same information Godsy provided to the his undergraduate university, the national engineering examiners, the MCAT, and the Medical School that resulted in his being accommodated on the basis of a learning disability.

In a letter dated September 18, 2002, the NBME denied Godsy's request for an accommodation for the USMLE Step 1 claiming Godsy had not demonstrated that he was "significantly impaired in one or more life activities". Godsy completed the exam without accommodations, but did not pass. Prior to the NBME's denial of Godsy's request for accommodation, the NBME did not seek independently to examine Godsy, nor did not meet or interview or otherwise independently evaluate Godsy.

The facts establish that Godsy has definite learning disabilities that substantially limit his major life activities of learning, reading and writing as compared to most people. [Exhibit A] Under the ADA, Godsy is entitled to a reasonable accommodation of additional time to take the USMLE Step 1 exam. NBME's refusal to provide Godsy with an accommodation of extra time for the USMLE Step 1 exam, despite knowing of Godsy's documented learning disabilities that are protected under the ADA, is a violation of Godsy's right under the ADA.

Godsy will be unable to complete his medical school education in the same manner as his classmates if he does not successfully complete the USMLE Step 1. Moreover, he will be placed at a distinct disadvantage of competing for quality residency positions if he must take the exam without accommodation for his disability. In the worst case scenario, Godsy's medical career and dream could end if he is unable to pass the USMLE Step 1, because the NBME will not accommodate his disability as required by the ADA.

### III. Arguments and Authorities

**A.**  **General Standard for Injunctive Relief**

The ADA was enacted in part, to provide "a clear and comprehensive national mandate for the elimination of discrimination ...and to provide clear, strong, consistent, enforceable standards addressing discrimination" 42 U.S.C. §12101(b)(1) and (2). The ADA specifically states that

> Any person that offers examinations or courses related to applications, licensing, or credentialing for secondary and post secondary education, professional, or trade purposes shall offer such examination or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. 42 U.S.C. §12189.

The ADA specifically includes the remedies set forth in 42 U.S.C. §2000a-3(a) for any violation of §12189, including preliminary and permanent injunctive relief. See 42 U.S.C. §12188(1)(a). Section 2000a-3(a) specifically provides that temporary or permanent injunctive relief is available as a remedy to persons aggrieved and to prevent further violations of law. 42 U.S.C.§2000a-3(a).

In general, the role of injunctive relief is to prevent a future harmful act and preserve the court's ability to render a meaningful decision on the merits. *University of Texas v.*

6

*Camenisch*, 451 U.S. 390, 395 (1981); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 719 (5th Cir.); *see also Tri State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 350, 355 (10th Cir. 1986) ("in issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.") (citing *Compact Van Equip., Co. v. Leggett & Platt, Inc.,* 566 F.2d 952,954 (5th Cir. 1978). Even though injunctive relief is an extraordinary remedy, courts grant the remedy when necessary to prevent irreparable injury and to preserve the plaintiff's ability to obtain meaningful judgment. *Productos Carnic, S.A. v. Central AM Beef*, 621 F.2d 683,686 (5th Cir. 1980). Preventing an ongoing violation of the ADA and reserving the ability to grant the protection authorized and guaranteed under the ADA clearly is within the realm of appropriate injunctive relief. *See* 42 U.S.C. §12188(a).

To obtain injunctive relief, the movant usually must show:

a.      the movant will suffer irreparable injury unless the injunction is issued;

b.      a substantial likelihood the movant will prevail at trial;

c.      that the threatened injury to movant outweighs any harm to the defendant; and

d.      that the injunction will not be adverse to the public interest.

*Women's Medical Ctr. of Northwest Houston v. Bell,* 248 F.3d 411,419 (5th Cir. 2001); *Hoover v. Morales,* 164 F.3d. 221,224 (5th Cir. 1998). The ADA specifically states, however, that one available remedy for redressing ADA violations is injunctive relief. 42 U.S.C. §12188. By specifically providing a statutory cause of action for injunctive relief for violations of the ADA, it is not necessary for Godsy to establish irreparable harm. *See U.S.*

*v. White*, 893 F. Supp. 1423 (C.D. Cal. 1995). Nevertheless, there is no adequate remedy at law and Godsy will be irreparably harmed by denial of the injunctive relief *See Cho v. Itco, Inc.*, 287 F. Supp. 1183 (E.D. Tex. 1991).

**B.      Godsy will be irreparably harmed without injunctive relief**.

To continue his medical school career and be licensed as a practicing physician in the State of Texas, Godsy must take and pass all three of the USMLE Step exams. Normally, the time for taking the Step 1 exam is before beginning the 3rd year of medical school.  Godsy is now in his 4th year and still has not been able to compete the exam because of the Defendant's illegal refusal to provide him with accommodations.  Further, the USMLE Step 1 exam is an important factor for students vying for residency programs at offering institutions.  Residency institutions will use Godsy's score on the USMLE Step 1 Exam to determine whether he is a qualified candidate for their programs.

As has been shown by his prior attempts at the USMLE 1 Exam, Godsy is placed at a great disadvantage because of his disabilities when required to take the USMLE without reasonable accommodations, and the learning disabilities put him at a distinct disadvantage, as compared to most people, and certainly his peers taking the exam. The playing field for the USMLE is not level, and as has been shown, Godsy's performance on the test will not be a full and complete measure of his abilities.  Without accommodations, the result is most likely a failing score again.   The consequences of another  failing score will essential prevent Godsy from becoming a doctor.

Because of the Defendant, Godsy is already behind his peers and another failing score will prevent him from continuing his medical training.  If he is unable to pass the

exam because his disabilities are not accommodated, as required by the ADA, Godsy would be asked to leave medical school and give up his dream of becoming a medical doctor. Thus, his whole future as a physician may be impacted by this one exam.

The significance of the USMLE examination demonstrates why injunctive relief is necessary. There simply is no adequate remedy at law if Godsy is denied his rights to reasonable accommodation. Sadly, no future judicial remedy could correct or undo the consequences of such events; there is no amount of money or other remedy at law that could compensate him for the loss he could suffer. Moreover, the only real remedy under Title III of the ADA is injunctive relief. There being no adequate remedy at law, Godsy will suffer irreparable harm if NMBE is allowed to violate Godsy's ADA right and withhold the accommodation to which he is entitled.

**C.     Plaintiff will Succeed on the Merits because Godsy has a learning disability protected by the ADA.**

Title III of the ADA prohibits discrimination against persons with disabilities in professional examinations and requires that such examinations be provided in a manner that is accessible to persons with such disabilities. 42 U.S.C. §12189. The Department of Justice ("DOJ") regulations promulgated under Title III of the ADA require that examinations covered by 42 U.S.C. §12189 be selected and administered in a manner that accurately reflects the individuals aptitude or achievement level rather than reflecting the individual's specific impairment.  An entity subject to 42 U.S.C. §12189 discriminates against a disabled individual in violation of the ADA when it fails to make a reasonable accommodation for a known physical or mental impairment. 42 U.S.C. §12112(b)(5)(A). The regulations promulgated under Title III of the ADA also specifically state that changes

9

in the length of time permitted for completing an examination may be an appropriate accommodation. 28 C.F.R. §36.309(b)(2).

28 C.F.R. §36.309(b)(1)(i) states:

"an examination covered by this Section must assure that (i) the examination is selected and administered so as to best insure that, when the examination is administered to an individual with a disability that impairs sensory, manual,or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)."

The NBME administers the USMLE as a nationwide examination for prospective physicians, which must be successfully completed to obtain a medical license in the United States. Accordingly, the NMBE is a covered entity and is required to comply with the provisions of Title III of the ADA. *See Gonzalez v. National Bd. of Medical Examiners,* 225 F.3d 620,626 (6th Cir. 2000). Because the NBME is subject to the ADA and a request for additional time is an appropriate accommodation, the issue is whether Godsy has a disability that is protected under the ADA.

For purposes of the ADA, a person is disabled if he or she suffers from a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42. U.S.C. §12102(2)(A). Although the ADA does not specifically define all of the terms used in the definition of disability, the DOJ, who has authority to implement regulations under Title III of the ADA, defines physical or mental impairment as including "specific learning disabilities." 28 C.F.R. §36.104. These regulations further define major life activity as including "walking, seeing, hearing, speaking, breathing, learning and working." Id §36.104(2). In interpreting the regulations, courts have concluded that the

10

major life activity of learning includes reading and writing. *See Bartlett v. New York State Bd. of Law Examiners,* 226 F .3d 69, 80 (2nd Cir. 1998); *Gonzalez,* 225 F.3d at 626; *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d, 141, 155 (1st Cir. 1998).

The substantially limits standard set forth in the ADA is not specifically defined in the statute. The preamble to the DOJ regulations, however, states "a person is considered an individual with a disability. . . when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. Pt. 36, app B.

The evidence presented in this case shows that Godsy has a mental impairment related to rate of information processing that substantially limits his major life activities of learning, reading, and writing. The test data reviewed and compiled by Dr. Trahan dramatically illustrates the scope of Godsy's learning disability. Dr. Trahan subjected Godsy to the WAIS-III test of intellectual functioning, as well as other tests, and reviewed the years of prior test results from similar exams. The results for various clusters of the test show that certain of Godsy's processing and reading related skills and abilities are below those of other 29 year old individuals and below those expected of persons with his academic background. [Exhibit A]

Dr. Trahan did not rely solely on test data in determining that Godsy has learning disabilities. He also analyzed Godsy's history of learning difficulties. Dr. Trahan finds significant the fact that Godsy had identifiable reading difficulties as early as elementary school. As noted above, those difficulties continued through middle school, high school and college, where he received accommodations from his schools and on standardized admissions and professional licensing exams.

11

The test data, coupled with his history of reading difficulties, establishes that, as compared to most people, Godsy is restricted as to the conditions, manner and duration under which he can perform the skills related to reading and writing. Accordingly, he has a disability that substantially limits a major life activity and he is entitled to reasonable accommodation in accordance with Title III of the ADA.

The evidence outlined above shows that Godsy has learning disabilities that preclude him from performing the tasks of learning and reading in the same manner as compared to most people. Those disabilities substantially limit his major life activities of learning, reading and writing. Under Title III of the ADA, Godsy is entitled to have those ADA rights acknowledged and protected by the NBME through the reasonable accommodation of additional time. 42 U.S.C. §12189. This showing, along with the other showings that the balance of the hardships tips in his favor significantly, that the injunctive relief furthers the public interest in supporting the rights of the disabled under the ADA, and that he will suffer irreparable injury if the injunctive relief is not entered, entitles Godsy to the injunction as sought herein.

**D.      An injunction will further the public interest.**

The clear legislative mandate behind enactment of the ADA indicates that protection of rights recognized by the ADA is in the public interest. See 42 U.S.C. § 12101(b)(1) and (2). Accordingly, the public interest in the ADA is furthered by ordering those who refuse to provide accommodations to disabled individuals to provide reasonable accommodations and comply with the law.

**E.     The balance of equities and hardship heavily favors Godsy.**

The potential injury to Godsy as indicated above could be devastating. As a result of NBME's refusal to provide the reasonable accommodations required by the ADA, Godsy could lose his opportunity to be a medical doctor. The potential hardship to Godsy, therefore, is very significant and, as noted above, could result in an irreparable injury to him.

The NBME, however, will suffer little if any hardship from an injunction. The NBME simply administers a nationwide test to all prospective medical students. The NBME has provided accommodations to test participants in the past and providing an accommodation to Godsy in this instance would do nothing to reduce NBME's ability to administer tests as it always has to future students. The bottom line is that an injunction has no significant impact on the NBME or its ongoing operations. Accordingly, the balance of equities and hardships weighs not just heavily in Godsy's favor, but totally in Godsy's favor.

## IV. Recent Opinion from the Northern District of Texas

Recently, in *Rush v. National Board of Medical Examiners*, 268 F. Supp. 2d 673 (N.D. Tex. 2003), the Northern District Court was presented with a case very similar to the present case. In *Rush*, the plaintiff was a second year medical student applying to take the same exam that Godsy is applying to take. The *Rush* plaintiff had a similar disability related to reading and learning. *See Rush* at 674. The court found that the plaintiff "has shown that he is an individual with a disability under the ADA because he is substantially limited in the major life activities of reading and learning when compared to most people." *Rush* at 678. Like the plaintiff in Rush, Godsy is also limited in the major life activities of

reading and learning as compared to most people, and should be given accommodations when taking the USMLE exams.

## V.

The Court should act to preserve and protect Godsy's rights under the ADA and to preserve Godsy's rights to be accommodated for his disability in accordance with the ADA. Without the injunction, Godsy will suffer irreparable injury, and the mandate of the ADA, as noted by Congress when it passed the legislation, will be violated. The Court should not allow the NBME to ignore the requirements of the ADA at the expense of a young man's future and livelihood.

## VI. Prayer

Godsy requests that this Court grant his request for a preliminary injunction directing that the NBME immediately cease and desist from its refusal to accommodate Godsy's request for reasonable accommodations on the USMLE Step 1 examination and ordering that the NBME immediately comply with the ADA by allowing Godsy the requested accommodation of double the standard time in which to take the USMLE Step 1 examination; and then the Step 2 examination, awarding such other and further relief as may be appropriate, in law or in equity, to which Godsy may otherwise by entitled.

Respectfully submitted,

BUSH, LEWIS & ROEBUCK, P.C.
1240 Orleans Street
Beaumont, Texas 77701
409/835-3521
409/835-4194 (Fax)

By: _____
     Kenneth W. Lewis
     Texas Bar #12295300
     Jeffrey T. Roebuck
     Texas Bar #24027812

ATTORNEYS FOR PLAINTIFF
JENNINGS TYSON GODSY

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a true and correct copy of the above and foregoing document has been furnished to all counsel of record by hand delivery on this the 6th_ day of April, 2004.

Elizabeth B. Pratt
Mehaffy Weber, P.C.
2615 Calder, Suite 800
Beaumont, TX 77702

**VIA HAND DELIVERY**

_____
Jeffrey T. Roebuck

15

# Center For Behavioral Studies
## Donald E. Trahan, Ph.D.

Adult and Child Neuropsychology
Clinical Consultation, Research, Education

3560 Delaware, Suite 105
Beaumont, Texas 77706
(409) 898-8222
Telefax: (409) 898-4946

Diplomate-American Board of
Professional Neuropsychology

NEUROPSYCHOLOGICAL REPORT
February 16, 2004

RE:  Jennings Tyson Godsy
     201 Tower Road
     Orange, Texas  77630
     (409)  735-8952
     SSAN:  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

BACKGROUND DATA:

Jennings Tyson Godsy is a 29-year old, right-handed, single,
Caucasian male who currently is in his fourth year of medical
school.  Mr. Godsy reportedly has a longstanding history of
learning disabilities.  Over the years he has been diagnosed
by various specialists with a disorder of written spelling.
He also has been noted to have significant spelling problems.
Over the years Mr. Godsy has been accommodations for testing,
primarily extended time.  However, when he applied for
accommodations to take the USMLE-Step 1 Test, the National
Board of Medical Examiners refused to allow him
accommodations.  Although Mr. Godsy has appealed this
decision once, the Board has maintained that Mr. Godsy does
not meet their criteria for accommodations.  Mr. Godsy has
taken the test twice without accommodations, failing on both
occasions.  He is once again appealing the decision to
disallow accommodations before he takes the test for a third
time.  In order to gather additional information regarding
Mr. Godsy's condition, as well as whether he meets the
criteria for accommodations, he was referred to me for
neuropsychological consultation.  The referral was made by
his attorney, Mr. Ken Lewis.

When I saw Mr. Godsy for the initial diagnostic interview, he
stated that he was initially suspected of having a learning
disability in the second grade.  At that time, he was noted
to be a very slow reader.  Additionally, his spelling was
quite poor.  At that time, she school district tested him and
elected to take him out of the Gifted and Talented Classes
and place him in regular classes.  Throughout his years in
elementary school, he continued to struggle in order to
complete tests and other projects within the time limit
allowed.  He also had trouble copying information from the

**EXHIBIT A**

Neuropsychological Report
Jennings Tyson Godsy

board to his paper.  By the time that he was approaching high
school, the problem was becoming more of an issue.  At that
time, he apparently was re-assessed and given in a learning
disability diagnosis.  Mr. Godsy stated that throughout his
years in high school he had accommodations for testing.  He
was allowed additional time to take tests.  These
accommodations continued in college.  He not only had
additional time accommodations, but also was allowed to take
tests in a separate room where he would be more isolated.
Mr. Godsy stated that the medical school has been very
cooperative in working with him to meet his special needs.
However, the National Board has thusfar been unwilling to
grant him accommodations.  This has caused him a great deal
of difficulty while taking the National Board Test, since he
has not been able to have sufficient time to complete the
work.  Mr. Godsy indicated that the Board has denied his
application because of their interpretation of prior test
scores.  The Board has maintained the position that
"discrepancy scores" in and of themselves are insufficient to
qualify one for accommodations.  The Board has maintained
that since Mr. Godsy's scores on most of the tests
historically have fallen within the average range or higher,
he has no need for accommodations.  Mr. Godsy stated that the
primary problem he continues to face is that of slowness in
rate of information processing.  Even though his level of
reading comprehension is fairly good, he continues to be a
very slow reader.  This remains quite problematic whenever he
attempts to take tests that require a lot of reading.

I have been able to review most of Mr. Godsy's prior testing.
First of all, I was able to review information provided by
the Bridge City Independent School District for testing that
was performed in 1990.  Testing from the school district
revealed that Mr. Godsy at that time earned a WISC-R Verbal
I.Q. of 119, a Performance I.Q. of 105, and a Full Scale I.Q.
of 114.  His Full Scale I.Q. score placed him within the high
average range of intellectual ability.  He also was
administered the Woodcock-Johnson Tests of Achievement-
Revised, as well as the Kaufman Test of Educational
Achievement.  On these various tests he earned standard
scores of 98 in Written Expression, 100 in Basic Reading
Skills, 113 in Reading Comprehension, 120 in Math
Calculations, 128 in Math Reasoning, and 71 in Spelling.  The
Spelling and Written Expression scores were noted to be
significantly lower than his measured level of intellectual
functioning.  At that time, he was identified as having a
learning disability for written expression and spelling.

Neuropsychological Report
Jennings Tyson Godsy

Mr. Godsy was tested again in the Bridge City I.S.D. in April
1993.  At that time, he earned a WAIS-R Verbal I.Q. of 119, a
Performance I.Q. of 105, and a Full Scale I.Q. of 114.
Although the pattern of subtest performance was a bit
different from the previous testing, his I.Q. scores were
identical with those obtained during the prior examination in
1990.  At that time, he also was administered a number of
achievement tests.  On the Woodcock-Johnson he earned
standard scores of 81 in Written Fluency and 104 in Writing
Samples, which produced a total standard score of 90 for
Written Expression.  On the Kaufman, he earned a standard
score of 72 for Spelling.  On the Wechsler Individual
Achievement Test, he earned standard scores of 61 in Spelling
and 114 in Written Expression.  The district once again noted
significant discrepancies for spelling and written
expression.  The diagnosis was retained and Mr. Godsy
continued receiving accommodations.

In 1999, Mr. Godsy was tested by Mrs. Tonya Goldbeck, an
educational specialist in Beaumont.  During that examination,
Mr. Godsy was administered the WAIS-III.  He earned a Verbal
I.Q. of 104, a Performance I.Q. of 119, and a Full Scale I.Q.
of 111.  The Full Scale I.Q. score was only 3 points
different than that obtained during the prior 2 examinations.
The report that I have from Mrs. Goldbeck does not report all
of the individual achievement test scores, although reference
is made to the WIAT.  The report does mention standard scores
of 77 in Spelling, 94 in Reading, and 127 in Arithmetic.
Mrs. Goldbeck did provide a diagnosis of Learning Disorder
NOS (315.9, DSM-IV), as well as Disorder of Written
Expression (315.2, DSM-IV).

Mr. Godsy was tested yet again in February and April 2002.
This evaluation was conducted by Claire E. Jacobs, Ph.D. a
psychologist in San Antonio.  During that examination, Mr.
Godsy earned a WAIS-R Verbal I.Q. of 99, a Performance I.Q.
of 126, and a Full Scale I.Q. of 110.  This placed him within
the high average range of intellectual overall.  Specific
achievement test scores are not reported in Dr. Jacobs
narrative.  However, she noted that Mr. Godsy's performance
fell within the superior range on arithmetic tests and in the
average range on tasks of reading.  A significant lower score
was noted for spelling, which was low average.  Dr. Jacobs
did note that on the Woodcock Reading Mastery Test-Revised,
Mr. Godsy was noted to have significant difficulty on an
array of reading tasks.  She also noted significant slowness
in response time.  Dr. Jacobs did note that Mr. Godsy's
performance was significantly below expectations for verbal

Neuropsychological Report
Jennings Tyson Godsy

memory.  She noted strengths in visual thinking and visual
organization.  Her overall impression was that Mr. Godsy's
test scores and clinical history were consistent with a
diagnosis of Learning Disorder NOS (315.9, DSM-IV) and
Disorder of Written Expression (315.2, DSM-IV).

Mr. Godsy's neurological history is essentially unremarkable.
There is no established history of head trauma with loss of
consciousness, CVA, TIA, seizures, neoplasms, or infectious
disease of the central nervous system.  His general medical
health also is quite good.  He is not currently being treated
for any health problems.  In terms of personal habits, Mr.
Godsy reports being a nonsmoker.  He reports only minimal use
of alcoholic beverages.  He denies any use of recreational
drugs.  Aside from previous testing for learning
disabilities, he has never required evaluation or treatment
for psychological reasons.

From an educational standpoint, Mr. Godsy reports having
graduated from Bridge City High School with an A-B average
overall.  He stated, however, that he did have accommodations
throughout his years in high school.  He also was an A-B
student while pursuing a degree in chemical engineering from
McNeese State University.  Again, he had time accommodations
as well as the benefit of testing in a separate room.  He
reported that while in medical school, he has maintained a B
average overall.  He reported that the medical school has
been very good in working with him, allowing him time
accommodations.


EVALUATION PROCEDURES:

Clinical Interview, Record Review, Neurobehavioral Status
Examination, Wechsler Adult Intelligence Scale - 3rd Ed.,
Woodcock Reading Mastery Test - Revised (Word Identification,
Word Attack, and Passage Comprehension Subtests), Language
Assessment Battery (Partial), Verbal Selective Reminding
Test, Continuous Visual Memory Test, Booklet Category Test,
Paced Auditory Serial Addition Test.  I elected not to
administer several procedures, primarily because of the fact
that he has been tested on multiple occasions during recent
years using a wide array of standardized intelligence
measures and achievement tests.  I have access to all of this
information, which reveals a very consistent pattern of
performance over a period of approximately 12 years.

Page 4

Neuropsychological Report
Jennings Tyson Godsy

CLINICAL OBSERVATIONS:

Jennings Tyson Godsy is a well-nourished, Caucasian male who appears h reported age of 29.  Mr. Godsy was very pleasant and cooperative during this examination.  His motivation and effort were excellent.  I do believe that his test scores accurately reflect his optimal level of functioning at this time.

Mr. Godsy's mood during this examination was normal.  Affect was appropriate.  He did not appear to be clinically depressed.  He did not appear to be anxious or nervous about the testing itself.  He responded well to encouragement and support and was able to complete all of the requested procedures without difficulty.

During this examination, Mr. Godsy exhibited no evidence of delusions, hallucinations, or other psychotic manifestations. His conversational speech was fluent and articulate.  There was no evidence of pressure or loose associations.  Judgment and reasoning were above average based on his responses to a variety of general comprehension and verbal abstraction items.  His insight regarding current circumstances seemed quite good.  Behaviorally, Mr. Godsy exhibited no evidence of serious inattention, irritability, restlessness, or agitation.  He was able to work in a goal-directed fashion for well over an hour at a time.  Other aspects of his cognitive status will be reported in the paragraphs that follow.

NEUROPSYCHOLOGICAL TEST RESULTS:

On formal examination, Mr. Godsy was alert and oriented to person, place, time, and circumstances.  Assessment of language functioning revealed that his expressive and receptive language abilities were well preserved and quite adequate for effective functional communication.

Followup assessment of intellectual functioning was conducted using the WAIS-III.  On the WAIS-III, Mr. Godsy earned a Verbal I.Q. of 114, a Performance I.Q. of 114, and a Full Scale I.Q. of 115.  This places him within the high average range of intellectual ability and at the 84th percentile overall.  Mr. Godsy's scores on the WAIS-III were quite consistent with prior testing of intellectual functioning. Previous test scores have all ranged from 110 to 114. Subtest analysis revealed that Mr. Godsy performed within the

Page 5

Neuropsychological Report
Jennings Tyson Godsy

high average range on all tests except for Digit Symbol
Coding, which was borderline normal.  He did exhibit some
slowness in written decoding of language symbols.  He also
performed within the borderline normal range on the Digit
Span Subtest.

Assessment of reading ability was conducted using selected
subtests from the Woodcock Reading Mastery Test-Revised.  On
the Woodcock-R, Mr. Godsy earned grade equivalence of 12.0 in
Word Identification, 16.9 in Word Attack, and 13.0 in Passage
Comprehension.  His standard scores were 89, 102, and 89,
respectively, when compared with others with his level of
education.  It is significant to note that his Word
Identification and Passage Comprehension scores were 26
points lower than his measured level of intellectual
functioning.  Of more significance, however, was the fact
that Mr. Godsy was a very slow reader, especially on the
Passage Comprehension Subtest.  On this subtest, the
individual is typically allowed 30 seconds to provide a
response before a cue is given to provide an answer.  If the
individual then does not given an answer within another 15
seconds or so, the procedure is to score the item as a miss
and proceed to the next item.  Mr. Godsy lost credit on 10
items because of taking extended amounts of time to provide
an answer.  This observation is consistent with those made
previously by other examiners.

Assessment of memory functioning revealed that Mr. Godsy's
recall of past information was well preserved.  Immediate
memory span was only within the borderline range when the
stimulus involved verbal material.  This was true not only
on the Digit Span Subtest from the WAIS-III, but also on a
measure of verbal supraspan.  Assessment of learning capacity
also revealed problems on measures of visual learning.  On
the Selective Reminding Test, he performed within the
moderately impaired range for long-term storage and within
the borderline range for consistent long-term retrieval.
However, visual learning revealed high average performance on
the CVMT, which measures recognition memory for complex
designs.

Assessment of executive functioning was conducted using the
Booklet Category Test.  On this test, Mr. Godsy earned a raw
score of 16, which places him within the average range of
ability.  The T-score was 52.

Formal assessment of rate of information processing was
conducted using the PASAT.  This is the measure on which

Neuropsychological Report
Jennings Tyson Godsy


Mr. Godsy most clearly showed deficits in rate of information
processing.  His standard scores fell within the moderately
impaired range on 3 of the 4 sections.  He performed within
the borderline range on the other subtests.


DIAGNOSTIC IMPRESSION:

Axis I:    (1)   Learning Disorder NOS (315.9, DSM-IV), With
                 Deficits in Reading, Written Expression, and
                 Spelling.

Axis II:   (1)   No Diagnosis (V71.09, DSM-IV).

Axis III:  (1)   No Established Major Health Problems.


SUMMARY AND RECOMMENDATIONS:

Jennings Tyson Godsy is a 29-year old, single, Caucasian male
who has a longstanding history of learning disorder.  This
has been documented extensively in records dating back at
least 14 years.  During this time, he has been seen by
numerous educational specialists, as well as a psychologist.
Reports have consistently confirmed diagnoses of Disorder of
Written Expression and Spelling Disorder.  Various
educational institutions have allowed Mr. Godsy
accommodations, primarily extended time to take tests.  These
accommodations have been provided throughout high school,
college, and medical school.

Results of my evaluation reveal that Mr. Godsy is continuing
to perform within the high average range of intellectual
ability, with a WAIS-III Full Scale I.Q. of 115.  This score
is entirely consistent with prior test scores obtained over
the last 14 years, all of which ranged from 110 to 114.
Additional testing revealed that Mr. Godsy is performing
within the low average range on measures of reading
recognition and reading comprehension.  His scores on these
measures were 26 points below his measured level of
intellectual ability, which based on the discrepancy method,
does qualify him for a learning disability diagnosis.
Further testing revealed borderline performance on measures
requiring rapid written production of language symbols.  He
also exhibited deficits in verbal learning, with performance
that was clearly below the normal range for someone his age.
The pattern of results from my examination, along with
results from prior evaluations, in my opinion are clearly

Page 7

Neuropsychological Report
Jennings Tyson Godsy

consistent with a learning disorder diagnosis.  In my
opinion, these findings are suggestive of mild dyslexia.
However, the learning disorder NOS diagnosis would perhaps be
most appropriate given the fact that his problems involve
written expression and spelling, as well as reading.

Thusfar, the National Board has maintained that Mr. Godsy
is ineligible for accommodations because of the fact that
his level of performance on untimed measures of ability
technically fell within the normal range, with average
performance in many areas.  Given his level of performance,
they have discounted the significance of the discrepancy
scores altogether.  However, my experience over the past 25
years in working with several thousand patients who have
experienced various types of learning problems is that
intelligent individuals who have attained higher level
education have often managed to compensate for these deficits
over a period of time.  Consequently, when they are given
underlined procedures, their level of performance may, in fact,
be "normal".  However, the Board's reasoning does not take
into consideration the very significant issue of rate of
information processing, which is often a serious problem for
individuals with reading disorders such as dyslexia and other
learning problems.  Mr. Godsy has shown a consistent pattern
of slowness in rate of information processing.  Those
problems with very evident during this examination and
documented through formal testing.  In view of this, I would
consider his request for additional time accommodations to be
reasonable and appropriate.  The minimum accommodation should
be 1.5 times the standard time limit, but the recommended
accommodation is that he be allowed twice the standard time.
Mr. Godsy has struggled for many years to deal with a
lifelong learning disability and with accommodations for
extra time has been successful in graduating from high
school, completing a degree in chemical engineering, and
completed 4 years of medical school.  This is exactly the
type of case that is addressed by the Americans Disabilities
Act (ADA).

If you should have additional questions regarding my
findings, please feel free to contact me.

Donald E. Trahan, Ph.D, ABPN
Clinical Neuropsychologist

Page 8