IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

**FILED**

P. M. _April 8_ 20 04

DAVID J. MALAND, CLERK

U.S. DISTRICT COURT

By _____

DEPUTY

| | | |
|---|---|---|
| JENNINGS TYSON GODSY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 1:04-CV-00053 |
| | § | |
| NATIONAL BOARD OF MEDICAL | § | |
| EXAMINERS, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MEMORANDUM OF LAW:
## THE AMERICANS WITH DISABILITIES ACT

TO THE HONORABLE U. S. DISTRICT JUDGE:

Defendant National Board Of Medical Examiners ("Defendant" or "NBME") submits

this Memorandum of Law relating to the Americans With Disabilities Act ("ADA").

### I.

### BACKGROUND

Plaintiff Jennings Tyson Godsy ("Plaintiff"), is a medical student at The University of

Texas Medical School in San Antonio who alleges that he must take and pass the United

States Medical Licensing Examination ("USMLE") Step 1 and Step 2 exams before the end

of his fourth year. *See,* Complaint ¶¶ 1, 8, 13. Plaintiff asserts that he has completed his third

year of instruction at the medical school. Complaint, ¶¶ 3, 12.[1] Plaintiff asserts that on one

occasion in the past, he applied to take the Step 1 exam and requested accommodations,

---

[1] Inconsistently, plaintiff asserts that passing Step 1 is a prerequisite to completing his third year of medical school. *See,* Complaint, ¶ 13.

which were denied. He did not pass.[2] He alleges that he later took the Step 1 exam a second time, without requesting accommodations and again did not pass. *See*, Complaint, ¶ 1. Plaintiff alleges that Defendant has violated the ADA in denying Plaintiff's request for an accommodation in taking the Step 1 exam, for which Plaintiff is requesting double the standard time for taking that exam. He also asserts that he should be permitted to take the Step 2 exam "with appropriate accommodations" when he passes the Step 1 exam. *See,* Complaint at ¶ 2.[3]

With respect to his alleged disabilities, Plaintiff claims that he has a "learning disability" related to neurocognitive functioning, which he alleges substantially limits his major life activities of learning, reading and working. *See*, Complaint, ¶ 3, 18, 26. Although Defendant provides reasonable accommodations in accordance with the ADA for individuals with documented disabilities, Defendant denies that Plaintiff has appropriately documented or otherwise proven that he is disabled within the meaning of the ADA and, is thus, entitled to the accommodations requested. Further, even if Plaintiff's claimed impairments were hypothetically treated as disabilities recognized under the ADA, the accommodations sought are inapplicable to the Step 1 exam in dispute.

In this case, Plaintiff's request for accommodations, made in 2002, was evaluated by highly regarded professionals who are experts in the conditions claimed by Plaintiff. Those experts concluded that the testing data presented by Plaintiff did not support his claims of a protected disability entitling him to the accommodations sought. The accommodations

---

[2] In fact, he did not take the Step 1 exam for which accommodations were requested. Instead, he twice took the exam without applying for accommodations.

[3] Plaintiff also broadly seeks the same accommodations for all of the USMLE exams, but any accommodations for Step 3 are determined by state licensing boards, not by NBME.

sought have no relevance to the format of the Step 1 test. The report of the initial reviewing expert, Joseph E. Bernier, Ph.D., is attached as Exhibit No. 1 to this report. The report of Nancy Nussbaum, Ph.D., who conducted a second evaluation of the data submitted by Plaintiff after suit was filed, is attached as Exhibit No. 2.

## II.

## DISCUSSION

### A.    Overview Of Applicable Provisions And Central ADA Issue.

Title III of the ADA prohibits discrimination against persons with disabilities in professional examinations such as the Step 1 exam. Specifically, 42 U.S.C.A. § 12189 provides as follows:

> Any person that offers examinations or courses related to applications, licensing, certification or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to **persons with disabilities** or offer alternative accessible arrangements for such individuals.

42 U.S.C.A. § 12189 (West 1995) (emphasis added). As an entity which develops the Step 1 exam and is responsible for decisions related to requested accommodations pertaining to the exam, Defendant does not dispute that the above-cited statute applies to it in this context. Indeed, Defendant provides reasonable accommodations in accordance with the ADA for individuals with documented disabilities who demonstrate a need for accommodation.

Before approving an individual's request for an accommodation, however, Defendant requires that the individual submit documentation establishing that the individual is, in fact, a disabled individual under the applicable provisions of the ADA. This approach is consistent

not only with the ADA but also with the regulations issued by the Department of Justice to implement Title III of the ADA, one of which provides as follows:

> Any private entity offering an examination covered by this section must assure that—(i) The examination is selected and administered so as to best ensure that, when the examination is administered **to an individual with a disability** that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)...

28 C.F.R. § 36.309(b)(1)(i)(2003) (emphasis added).

The central ADA issue in this case is whether Plaintiff is a disabled individual under the ADA. Given the vital importance of this question, Defendant will now discuss what Plaintiff must establish in order to show that he is disabled under the ADA.

**B.      Plaintiff Must Establish That He Is Disabled Under The ADA; Plaintiff Has Not Met This Burden.**

Determining whether a person is disabled within the meaning of the ADA is a highly individualized inquiry. Under the general provisions of the ADA, "disability," with regard to an individual, is defined as a physical or mental impairment that substantially limits one or more major life activities of that individual. 42 U.S.C.A. § 12102(2)(A) (West 1995). The ADA fails to define the terms "physical or mental impairment," "substantially limits," or "major life activities," and no agency has been given the authority to issue regulations implementing the generally applicable provisions of the ADA. *See Gonzales v. National Board of Medical Examiners*, 225 F.3d 620, 626 (6th Cir. 2000), *cert. denied*, 532 U.S. 1038 (2001). However, the Department of Justice has, in its regulations implementing Title III of the ADA, defined disability as follows:

> Disability means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual...

28 C.F.R. § 36.104 (2003). Thus, in addition to having a physical or mental impairment, in order to be disabled under the ADA, the individual in question's impairment must **substantially limit** one or more of that person's major life activities. Importantly, pursuant to the Department of Justice's preamble to the regulations it issued implementing Title III, whether a limitation is a "substantial limitation" is evaluated in terms of the **general population**. *See Gonzales*, 225 F.3d at 626 (emphasis added). Specifically, the Department of Justice preamble states that when deciding whether a person is "substantially limited," an analysis is conducted as to whether "the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed **in comparison to most people**." 28 C.F.R., part 36, App. B (West 2003) (emphasis added).

In discussing impairments under the employment provisions of the ADA, the Supreme Court has made it clear that not all impairments are substantially limiting:

> Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build, or singing voice—are preferable to others, just as it is free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 490-91 (1999) (emphasis original). In the *Sutton* case, the Supreme Court cited to two dictionaries in stating that although the ADA does not define "substantially limits," "substantially" suggests "considerable," "specified to a large degree," "in a substantial manner," "considerable in amount, value, or worth," "being that specified to a large degree or in the main," "relating to or proceeding from the essence of

a thing; essential" and "of ample or considerable amount, quantity or dimensions." *Sutton*, 527 U.S. at 491. Thus, and as is also indicated in *Gonzales*, 225 F.3d at 627, n. 12, the ADA only protects individuals with impairments that limit them from one or more major life activities in a "major way, to a considerable amount, or to a large degree," but not those impairments that limit an individual "in a trivial or even moderate manner." More recently, in *Toyota Motor Mfg. Kentucky, Inc. v. Williams*, 534 U.S. 184, 196-97 (2002), the Supreme Court defined "substantial" in an ADA employment case virtually identically to the way it did in *Sutton*.

With respect to case law precedent, *Price v. National Board of Medical Examiners*, 966 F.Supp. 419 (S.D. W.Va. 1997), is instructive in this matter. In that case, three medical students sought additional time to take Step 1 of the USMLE. Significantly, the Court noted that the purpose of the ADA is **not** "to allow individuals to advance to professional positions through a back door. Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering the front door." *Price*, 966 F.Supp. at 421-22 (citation omitted). The Court then stated that if it were to grant testing accommodations to those who are not disabled under the ADA, it would be allowing individuals to advance through the "proverbial back door." *Price*, 966 F.Supp. at 422. To do so, as stated by the Court, would subvert the integrity of the USMLE and hinder the NBME's ability to distinguish between qualified and unqualified students. *Price*, 966 F.Supp. at 422.

The *Price* case, like the instant case, involved the issue of whether the plaintiffs had a disability under the ADA and were "substantially limited" in a major life activity. After

reviewing pertinent legislative history, regulations, and case law, the Court determined that when evaluating whether an impairment is substantially limiting, the issue to be resolved is whether the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed "in comparison to most people in the general population." *Price*, 966 F.Supp. at 422 (emphasis original). After deciding that the plaintiffs were able to learn as well as or better than the average person in the general population, the Court entered judgment for the defendant, NBME.

Factually, in *Price*, each of the three plaintiffs had been diagnosed with, among other disorders, ADHD, and each forwarded applications to the NBME requesting additional time and private rooms when taking Step 1 of the USMLE. The NBME denied the requests, and plaintiffs filed suit for injunctive relief. After reviewing the particular allegations and circumstances of each plaintiff, the Court concluded that none of the plaintiffs had provided sufficient documentation to support a clinical diagnosis of their alleged disorders, including ADHD. *Price*, 966 F.Supp. at 423-24.

The *Gonzales* case is also similar to the instant case. In *Gonzales*, the plaintiff, like the Plaintiff herein, requested extended time to take the Step 1 exam because of an alleged learning disability. The federal district court denied plaintiff's request for injunctive relief, and the Sixth Circuit affirmed that decision. Further, as in the instant case, although plaintiff's medical school allowed plaintiff extra time on examinations, the NBME denied plaintiff's request for extended time because plaintiff did not prove that he was a disabled individual under the ADA. *Gonzales*, 225 F.3d at 623. After plaintiff took the Step 1 exam twice without accommodations, failing both times, he applied to take the Step 1 exam a third

Case 1:04-cv-00053-TH   Document 6   Filed 04/08/04   Page 8 of 21 PageID #: 64

time, again requesting accommodations. *Gonzales*, 225 F.3d at 623-624. After his request for accommodations was again denied by the NBME, Gonzales filed suit against the NBME alleging that he was a covered individual under the ADA and thus was entitled to additional time to take the USMLE Step 1 exam.

After an evidentiary hearing, the federal district court denied Gonzales' request for injunctive relief based upon, among other things, its finding that there was no substantial likelihood that Gonzales would succeed on his claim because he was not disabled under the ADA. *Gonzales*, 225 F.3d at 625. The district court also relied on the NBME's experts in concluding that plaintiff's performance in reading and writing tests fell within the average to superior range when compared to most people. *Gonzales*, 225 F.3d at 625.

On appeal, the Sixth Circuit recognized that the only question in the case was whether Gonzales was disabled within the meaning of the ADA. *Gonzales*, 225 F.3d at 626. In addressing this issue, the Sixth Circuit appropriately recognized that when determining whether an individual is "substantially limited" in one or more major life activities, that individual's abilities must be compared to the general population. *Gonzales*, 225 F.3d at 626.

With respect to plaintiff's claim that his reading was restricted when compared to the average person, the *Gonzales* Court found that Gonzales was not substantially limited in reading because he could read as well as the average person. *Gonzales*, 225 F.3d at 629. In reaching that conclusion, the Court specifically stated that Gonzales did not fit within Congress's vision of the disabled population, citing to the following: Gonzales graduated from high school with a 4.3 (out of 5.0) grade point average; Gonzales had no formal accommodations for alleged learning disabilities during high school; Gonzales scored 1050

on his SAT, taking the test without accommodations; and, he earned a grade point average of 3.15 out of 4 in his undergraduate years when he majored in physiology and only had accommodations during his junior and senior years. *Gonzales*, 225 F.3d at 629-30. Finally, the Court rejected Gonzales' claim that he was disabled in the major life activity of working because, when compared to most people, his impairments did not substantially limit his ability to work. *Gonzales*, 225 F.3d at 630. In the end, the Sixth Circuit affirmed the federal district court's order denying injunctive relief and concluded that Gonzales had no likelihood of success on the merits. *Gonzales*, 225 F.3d at 632.

Consistently, in *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141 (1st Cir. 1998), the First Circuit ruled that the plaintiffs (a student diagnosed with ADHD, among other disorders, and his parents) failed to meet their burden of showing probability of success on the merits that the student was disabled. Although the Court found that ADHD may be a mental impairment under the ADA, the Court ruled that the plaintiffs did not meet their burden of showing they were likely to succeed in proving that the student suffered a substantial limitation of a major life activity (learning). In reaching this determination, the Court compared the student to the average person in the general population. The Court found it important that the student had not experienced significant academic difficulties and excelled academically for most of his years. The Court reasoned that although the student's hyperactivity and distractibility may have affected his capacity to reach his maximum learning potential, there was not sufficient evidence that it had substantially impaired his basic learning abilities. *Bercovitch*, 133 F.3d at 155-56.

Applying the above to the instant case, Defendant denies that plaintiff is a disabled individual under the applicable provisions of the ADA. Therefore, Plaintiff is not entitled to accommodations pertaining to the Step 1 exam. More particularly, and as will be shown by the evidence and testimony to be presented by Defendant at the injunction hearing, the documentation which Plaintiff has submitted to Defendant regarding his alleged disability does not establish that Plaintiff has a physical or mental impairment that substantially limits one or more of his major life activities.[4]

## C. Plaintiff's Diagnoses Do Not Entitle Plaintiff To The Accommodations Sought.

Even if, hypothetically, the Court gave Plaintiff the benefit of having a disability, as that concept is recognized and protected by the ADA, the Plaintiff must still be denied relief because the accommodations are not appropriate for the Step 1 exam. The Step 1 exam requires no writing and no spelling; it is a multiple choice test taken by computer. Further, the exam tests only for knowledge of what should be well established information well understood by the examinee. Thus, none of the reading comprehension components of Plaintiff's prior testing, even as articulated by his own experts, are implicated.

### III.

### CONCLUSION

Plaintiff bears the burden of establishing that he is a disabled individual under the ADA entitled to accommodations pertaining to the Step 1 USMLE. Plaintiff has not

---

[4] Moreover, Plaintiff does not fit Congress' portrayal of a disabled person, as reflected in 42 U.S.C. § 12101(a)(6), in that he does not "occupy an inferior status in our society," and is not "severely disadvantaged socially, vocationally, economically, and educationally." In short, as was the case in *Gonzales*, 225 F.3d at 629-30, Plaintiff is not a member of the severely disadvantaged group Congress envisioned when it enacted the ADA. *See also Bercovitch*, 133 F.3d at 155-156 (holding that plaintiff, who

submitted documentation to Defendant which satisfies this burden.   Therefore, Plaintiff's request for injunctive and all other relief must be denied.

> Respectfully submitted,
>
> MEHAFFYWEBER, P.C.
> Attorneys for Defendants
>
> By: _Elizabeth Pratt_
> ELIZABETH B. PRATT, Of Counsel
> State Bar No. 16239450
> PATRICIA D. CHAMBLIN, Of Counsel
> State Bar No. 04086400

Post Office Box 16
Beaumont, Texas  77704
Telephone: 409/835-5011
Telecopier:  409/835-5177

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded via hand delivery to the following on this the ___8___ day of April, 2004:

Mr. Kenneth W. Lewis
Mr. Jeffrey Roebuck
Bush, Lewis & Roebuck, P.C.
1240 Orleans Street
Beaumont, Texas  77701

_Elizabeth Pratt_
ELIZABETH B. PRATT

was diagnosed with ADHD, was not disabled under the ADA because, in part, his alleged disability did not significantly affect his academic success).

BEAULITIGATION:627332.1

11

## National Board of Medical Examiners
## Consultant Review Form

**Consultant:** Joseph E. Bernier, Ph.D.          **Case Review Hours** 4.5

**Due Date:** 26-Aug-2002          **Conference Hours** 0

**Examinee:** Godsy, Jennings T.          USMLE Step 1 - 2002

**ID Number:** 5-110-077-4

☐ Diagnosis is supported by documentation.          ☒ Diagnosis is NOT supported by documentation.

☐ Accommodation is supported and justified.          ☒ Accommodation is NOT supported and justified.

Comments:

## RECEIVED

AUG 2 6 2002

OFFICE OF
TEST ACCOMMODATIONS

Report Case Review and Conference Hours.
Please fax to the NBME Office of Test Accommodations
at (215) 590-9422 by the Due Date shown above.



DEFENDANT'S
EXHIBIT
1

GODSY, Jennings T. #5-110-077-4

## Joseph E. Bernier, Ph.D.

5 Pine West Plaza, Suite 508
Washington Avenue Extension
Albany, New York 12205

Licensed Psychologist

(518) 452-4232

August 26, 2002

### CONFIDENTIAL

In Reference To Step 1 Examinee

Name:        GODSY, JENNINGS T.
USMLE ID:    # 5-110-077-4

RECEIVED

AUG 2 6 2002

OFFICE OF
TEST ACCOMMODATIONS

Shelby R. Keiser, Manager
Office of Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Dear Ms. Keiser:

The medical student who is identified above is asking for additional time (double time) and a private location when he takes Step 1 of the medical licensing examination. Mr. Godsy provided documentation of having had similar accommodations in the past that began when he was in the 10th grade and identified as "learning disabled". Repeatedly, past psychological evaluations have described this man as displaying significant spelling and writing difficulties. More recently (2002), problems in reading fluency, decoding words, and verbal learning have been added to his problem list. Mr. Godsy's file contains documentation that he has received special education and vocational rehabilitation support for his alleged learning disabilities. It also appears that Mr. Godsy is allowed double-time and a separate, quiet location when he takes medical school examinations and that he was provided similar "relief" on the MCAT, professional engineering examinations, and during college and much of high school.

In my opinion, there are many problems with the materials offered and used to support this individual's need for accommodation on Step 1 and, as a result, I cannot recommend that the Board provide him with a non-standardized testing circumstance at this time. The problems and my reasoning will be discussed below.

1

GODSY, Jennings T. #5-110-077-4

Two relatively recent psychological evaluations are among the documents that Mr. Godsy has used to support his allegation of a learning disorder and need for accommodation. The most recent was performed by Claire E. Jacobs, Ph.D. and was completed in April 2002. The earlier evaluation, performed by Tanya Goldbeck, M.Ed. who is reported to be a licensed educational diagnostician, was done in February 1999. Both examiners concluded that Mr. Godsy displayed a Writing Disorder (DSM-IV #315.2) and a Learning Disorder / NOS (DSM-IV #315.9) that, to paraphrase, manifests itself as impairment in reproducing things that he perceives.

The first problem here is that the relationship between writing, spelling, and motor expression difficulties and taking a multiple-choice examinations is an unclear relationship. Writing skills are not really measured or, in themselves, all that relevant on Step 1. Indeed spelling difficulties may reveal underlying phonological problems that ultimately impact the more relevant construct of reading skill, but the evidence making this connection is contradictory at best in Mr. Godsy's case. For example, Dr. Jacobs reported Woodcock Reading Mastery Test-Revised standard scores for basic reading skills as follows.

| | |
|---|---|
| Letter Word Identification = 84 | (a Below Average score) |
| Word Identification = 87 | (also a Below Average score) |
| Word Attack = 108 | (an Average score) |

This data would suggest that whatever difficulties exist in reading accuracy cannot be reasonably attributed to basic problems in phonological processing because the Word Attack test is completely normal. Moreover, the evidence of impairment in reading accuracy is contrary, or not substantiated, by Mr. Godsy's reportedly Average performance on the WRAT-3 Reading test (standard score = 107), which is a test that measures the same fundamental reading skill as does the WRMT-R Word Identification test. These data challenge any impression that one might have obtained from the WRMT-R of impaired reading accuracy and impairment in "decoding" words.

To take the idea of "relevance" one step further, professional licensing examinees most often are asked to read and respond to test questions, sentences and passages and not to lists of isolated words. When asked to do this very thing, that is to read and respond to sentences and short passages, Mr. Godsy was able to perform at a level that would be considered to be "Above Average". Specifically, Dr. Jacobs reported that Mr. Godsy achieved an age-based standard score of 114 when examined with the WRMT-R Passage Comprehension task, which is an "Above Average" score for someone at his age. Certainly, the WRMT-R does not include medical content, but that is part of what makes it a test of reading skill and not acquired medical knowledge. The point is that Mr. Godsy's alleged learning disabilities do not appear to be in areas that are directly relevant to the USMLE and also that the test data fail to indicate functional impairment in basic academic skills, like reading comprehension, that are relevant.

Although I have focused upon data from Dr. Jacobs' examination, the picture appears to be about the same as found in the earlier evaluation performed by Ms. Goldbeck (1999),

2

GODSY, Jennings T. #5-110-077-4

that is, there is a failure to document functional impairment in reading skills. In fact, Ms. Golbeck did not provide a valid measure of reading (or writing) at all when she worked with the Examinee. Specifically, Ms. Goldbeck apparently used the WIAT to examine reading, writing, and other academic skills. However, the "old" WIAT (we are now using the WIAT-II) has no norms for individuals who are the age that Mr. Godsy was when he met with Ms. Goldbeck. He was 23 years old at the time and well out of high school. In short, the educational examiner employed a test that was not intended for use with a college student. (The WIAT-II, in contrast, does provide adult norms.)

Both Dr. Jacobs and Ms. Goldbeck seem to stress in their respective reports the occurrence of discrepant scores between tests of intelligence and achievement tests. Both examiners provide Wechsler Adult Intelligence Scale test data that shows Mr. Godsy to have performed Well Above Average on measures of fluid reasoning and perceptual problem solving, yet within the Average range on measures of general verbal ability. Both examiners point out that when they compared Mr. Godsy's IQ-test performance to his tested achievement in reading, writing, and spelling, that they found that he was functioning well below expectations given his intelligence test scores. Both Dr. Jacobs and Ms. Goldbeck used this evidence of discrepancy to argue that Mr. Godsy is learning disabled. However, IQ – achievement discrepancy or not, this man demonstrated Above Average skill in reading comprehension. According to DSM-IV (the diagnostic standard used by both examiners), one needs to display academic skill test scores that are discrepant from expectations based upon the age of the subject as well as discrepant with expectations derived from level of intelligence. Age-based standard scores are the preferred values for performing this DSM-sort of discrepancy analysis. Using the age-based standard scores for reading comprehension from the WRMT-R, it is clear that Mr. Godsy is performing above most others at his age (standard score = 114, Above Average). Stated differently, Mr. Godsy did not display reading comprehension test scores that are outside and below normal limits for someone of his age. Reading comprehension does not appear to be an area of deficit as evaluated by the WRMT-R and the data does not corroborate the idea of problems in reading as relevant to the USMLE.

Dr. Jacobs noted that she observed that Mr. Godsy's reading response time was slow. However, this clinical or qualitative observation was not corroborated by any test that is explicitly designed to measure reading speed or fluency. No such test was used. If administered properly, the WRMT-R Reading Comprehension test employs time limits, albeit fairly generous ones. But no specific measure of timed reading was used by either Dr. Jacobs or Ms. Goldbeck.

I would also like to point out that the alleged learning disability in perceptual-motor functioning is not consistent with the Wechsler data. Mr. Godsy achieved a PIQ = 126, which is a Well Above Average score, on the WAIS-R when tested by Dr. Jacobs. When tested by Ms. Goldbeck in 1999, he earned a Well Above Average PIQ on the WAIS-III (PIQ = 119) and a Perceptual Organization Index score of 138, a performance that falls in the Upper Extreme.

3

GODSY, Jennings T. #5-110-077-4

In a similar vein, Dr. Jacobs reported that this Examinee had difficulties with recall of verbal material. She seems to have based her conclusion upon the fact that Mr. Godsy scored Below Average on Logical Memory I and II from the WMS-R. Logical Memory I is a test of new learning. The USMLE is not a test of learning. Rather it requires examinees to recall information that is presumed to have been well-established or "over-learned". Dr. Jacobs' Wechsler test data would not support the contention that this man has general impairment in recalling previously acquired or crystallized knowledge. Note that he earned an Above Average scaled score on Information (13) and on Comprehension (15), success on both tests being dependant upon one's ability to recall information from memory (especially the "Information" test).

Turning to the history, Mr. Godsy provided high school records pertaining to the LD diagnosis used to identify him as in need of assistance. The records do document notable discrepancies between his performance upon measures of intelligence and certain measures of achievement and also performance upon standardized tests of writing fluency and spelling (e.g., WJ-R, KTEA, WIAT) that fall outside and below normal limits. Historically, according to the test record, spelling and writing speed have been problematic …at least during high school. I make this statement in a qualified way because his school records, as available in the case file, display Average (and, in some instances, better than Average) Metropolitan Achievement Test and SRA Achievement scores in spelling, language arts, and reading when tested in the 2nd grade, the 7th grade, and the 9th grade. While test scores are not available for each and every year, those that are available do not corroborate the allegation of learning disability or performance that is discrepant from expectations based both upon age and IQ.

Overall, I cannot support Mr. Godsy's request for accommodation primarily because the psychological test data fails to demonstrate current functional impairment in an academic skill that is directly relevant to the USMLE. Writing, in and of itself, is not measured by the medical licensing examination, nor is spelling a measured construct. Further, it is not exactly clear what the problem is that Dr. Jacobs and Ms. Goldbeck are referring to in diagnosing a "Learning Disorder / Not Otherwise Specified". However, the idea that Mr. Godsy has a major problem with respect to perceptual-motor functioning, which they seem to be describing and referencing with the LD/NOS label, is contrary to his high scores on the performance portion of the WAIS-R and WAIS-III. Further, an early history of learning difficulties, as is generally the case with LD individuals, does not "come through" in the school records prior to the 10th grade.

Joseph E. Bernier, Ph.D.

| Examinee: GODSY, JENNINGS T. | ID: 5-110-077-4 | USMLE STEP 1 |

Diagnosis and accommodation are not supported by the documentation.
Case Review Hours: 4.5          Case Conference Hours: 0.0

4

MAR 2 9 2004

# AUSTIN NEUROLOGICAL CLINIC FOUNDED 1970

OFFICE:      711 WEST 38TH STREET, BLDG. F., AUSTIN, TEXAS 78705 (512) 458-6121
MAILING:     P.O. BOX 300669, AUSTIN, TEXAS 78703
FAX:         (512) 452-5567 BUSINESS
FAX:         (512) 452-9171 HEALTH CARE

NEUROLOGY

J. DOUGLAS HUDSON, M.D.
ALBERT B. HORN, III, M.D.
MICHAL A. DOUGLAS, M.D.
MICHAEL G. HUMMER, M.D.
DAVID W. MORLEDGE, M.D.
KENT T. ELLINGTON, M.D.
JOHN A. BERTELSON, M.D.

ASSOCIATE
NANCY CHILDS, M.D.

NEUROPSYCHOLOGY
DAVID R. STEINMAN, Ph.D.
NANCY L. NUSSBAUM, Ph.D.
DAVID M. TUCKER, Ph.D.
MELISSA R. BUNNER, Ph.D.

ADMINISTRATOR
MARCENA SORRELS

## ATTORNEY WORK PRODUCT, PRIVILEGED AND CONFIDENTIAL

March 21, 2004

### REVIEW OF RECORDS

Ms. Suzanne Williams
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Re:   Mr. Jennings "Tyson" Godsy

Dear Ms. Williams:

I have reviewed the materials submitted to me by the National Board of Medical
Examiners (NBME) regarding Mr. Jennings "Tyson" Godsy (d.o.b. 02/16/75), who is
requesting special accommodations for the United States Medical Licensing Examination
(USMLE) based on the diagnosis of a learning disability.   The materials that I have
reviewed include:

1.  Questionnaire for USMLE Step 1 and 2 Applicants Requesting Test Accommodations

2.  Certification of Prior Test Accommodations, Leonard E. Lawrence, M.D., Associated
    Dean for Student Affairs, the University of Texas Health Science Center at San
    Antonio, Documenting That the Applicant Received Additional Examination Time
    (Maximum Double); Quiet, Isolated Test Environment as Necessary

3.  Letter, 04/12/02, J. Tyson Godsy, Requesting the Special Accommodations of
    Additional Time and Modifications in Testing on the USMLE Due to Learning
    Disability,   Noting   Accommodations   Received   During   Medical   School,
    Undergraduate Studies, General High School Education, The Fundamentals of
    Engineering Exam, MCAT, SAT Exam, Advanced Placement Exams for College
    Credit, and TASP Exam

4.  Letter, 04/17/02, Claire E. Jacobs, Ph.D., Clinical Psychologist, Recommending
    Extended Time (Double) and Testing in a Cubicle or Private Room for Exams

DEFENDANT'S
EXHIBIT

Page 2
Jennings "Tyson" Godsy
March 21, 2004

5. Neuropsychological Update, 02/06 - 04/12/2002, Diagnosis Learning Disorder, NOS (Visual Perception – Expressive Problems) by History, Disorder of Written Expression

6. MCAT Examination 1999, Documentation of Accommodations

7. MCAT Examination 1997, Documentation of Accommodations

8. Fundamentals of Engineering Exam, Documenting Accommodations

9. Dental Admission Test 1998, Documenting Accommodations

10. Advanced Placement Test, 1993, Documenting Accommodations

11. Letters from Medical School and Undergraduate Universities, Stating Testing Accommodations

12. Testing Report, 02/09/99, Tanya Goldbeck, M.Ed., Licensed Professional Counselor, Educational Diagnostician; Specific Disability Diagnoses: DSM 315.9 Learning Disorder, Not Otherwise Specified, DSM 315.2 Disorder of Written Expression

13. Letter, 03/22/99, Tanya Goldbeck, M.Ed., Discussing "Output Learning Disability" as Basis for Written Expression Disorder, Requesting Accommodations

14. Comprehensive Individual Assessment, 10/02/90, Bridge City Indepdent School District, Learning Disabled Eligibility – Learning Disabled

15. Comprehensive Individual Assessment, 05/18/93, Bridge City Independent School District, Learning Disabled Eligibility – Learning Disabled

16. Additional Testing and Report Card Prior to Testing for Learning Disability

17. Letter, 04/17/2002, Claire E. Jacobs, Ph.D., Clinical Psychologist, Requesting Accommodations

18. Neuropsychological Update, 02/06/02 – 04/12/2002, Claire E. Jacobs, Ph.D., Diagnostic Impressions: 315.9 Learning Disorder, Not Otherwise Specified (Visual Perception – Expressive Problems, by History), 315.2 Disorder of Learning Expression

The following analysis is based on records submitted to me by the NBME. It is important to note that my opinions are not meant to diagnose this individual. These opinions are based on a review of records, and I did not conduct an interview or evaluation with Mr. Godsy. The purpose of the review is to address adequacy of Mr. Godsy's records to document the diagnoses and rationale for accommodations requested, and to determine whether this documentation meets the standards of the Americans With Disabilities Act.

Page 3
Jennings "Tyson" Godsy
March 21, 2004

After reviewing all of the data, it is my opinion that Mr. Godsy's documentation is not adequate to establish a diagnosis of a reading disorder requiring accommodations on the USMLE. It is my opinion that additional information is needed before the diagnosis of a learning disorder requiring accommodation on the USMLE can be demonstrated. Therefore, there is currently no rationale for accommodations on the USMLE.

Mr. Godsy has received accommodations (e.g., extended testing time, testing in a private room) in a number of settings in the past. It appears that these accommodations were based on data and documentation from four evaluations in the past: Bridge City Independent School District, 10/02/90; Bridge City Independent School District, 05/18/93; Tanya Goldbeck, M.Ed., 02/09/99; Claire E. Jacobs, Ph.D., 02/06 – 04/12/2002.

It is my opinion that this previous documentation does not meet current standards and is not sufficient to demonstrate that Mr. Godsy has a learning disorder that requires accommodations on the USMLE. I would like to review each of these evaluations as pertains to the question of a learning disorder that requires accommodations on the USMLE.

1. Bridge City Independent School District, Comprehensive Individual Assessment, 10/02/90

In this evaluation, Mr. Godsy was administered the Woodcock-Johnson Tests of Achievement – Revised (WJ-R), the Kaufman Test of Educational Achievement, and the Wechsler Intelligence Scale for Children – Revised (WISC-R). His academic achievement in spelling, as measured by an individually administered standardized test of academic functioning, was substantially below that expected given his chronological age, measured intelligence, and age-appropriate education. Currently, in the field of learning disabilities, an impairment or deficit in spelling is generally not accepted as sufficient evidence for making the diagnosis of a disorder of written expression. It is felt that more widespread impairment in the area of written expression must be demonstrated to diagnosis a disability in this area. An impairment of spelling or spelling dyspraxia may be a symptom of a learning disorder, but it is not sufficient in and of itself to make this type of diagnosis.

Mr. Godsy's documentation does show that he has a discrepancy between his IQ score (Full Scale IQ = 114) and his performance on a written expression measure (SS = 98). Although Mr. Godsy's achievement, as measured by an individually administered standardized test of written expression, is substantially below that expected given his chronological age, measured intelligence, age-appropriate education, the disturbance in academic functioning is not felt to significantly interfere with academic functioning or activities of daily living that requires that skill. Although his written expression was discrepant, his performance in this area was found to be at the 44th percentile, which would be considered to be in the average range for the population. Thus, Mr. Godsy's disturbance or discrepancy in the area of written expression would not be described as a disability.

Page 4
Jennings "Tyson" Godsy
March 21, 2004

Even if Mr. Godsy's impairment in spelling was taken into consideration, it is my understanding that no writing or spelling is required on the USMLE.

2.  Bridge City Independent School District, Comprehensive Individual Achievement, 05/18/93

In this evaluation, Mr. Godsy was found to have a discrepancy from his abilities and below average functioning in the areas of spelling on the Kaufman Test of Educational Achievement (SS = 72, Percentile = 3) and the Wechsler Individual Achievement Test (SS = 61, Percentile = .5). He also showed this type of impairment on the Writing Fluency subtest from the WJ-R (SS = 81, Percentile = 10).

Even if Mr. Godsy was diagnosed with a disorder of written expression based on the above data, accommodations would not be required on the USMLE, given that this test does not require spelling or writing fluency.

3.  Evaluation, 02/09/99, Tanya Goldbeck, M.Ed.

Ms. Godsy continues to show a discrepancy and impairment in spelling in Ms. Goldbeck's evaluation. She further cites impairment in written expression as evidenced by performance on the Test of Written Language. However, only a qualitative analysis of this measure is provided, because there is not normative data for Mr. Godsy's age group. In any case, please see the discussion in number 2 and 3 above regarding this area of achievement and the USMLE.

Ms. Goldbeck notes a number of areas of relative impairment for Mr. Godsy (e.g., processing speed, working memory). She notes that they are significantly below Mr. Godsy's intellectual abilities. Nevertheless, they were found to be in the average range* (Working Memory = 40th percentile, Processing Speed = 27th percentile). Also, Ms. Goldbeck does not demonstrate any areas of functional impairment in test data of academic achievement that pertain to the USMLE. In particular, Mr. Godsy's reading was found to be in the average range on the WIAT (SS = 94, Percentile = 34).

*[Conventionally, the 16th or 25th percentile is often used as the lower end of the average range. The 16th percentile represents one standard deviation below the mean. The 25th percentile is recognized as the more liberal cutoff.]

4.  Neuropsychological Update, Claire E. Jacobs, Ph.D., 02/06/2002 – 04/12/2002).

First, the data that was presented was based on a number of measures that would be considered to be outdated at the time that Dr. Jacobs administered them in 2002. Mr. Godsy was administered the Wechsler Memory Scale – Revised in 2002. This is the second edition of this measure. The Wechsler Memory Scale – Third Edition was published in 1997. Mr. Godsy was administered the WAIS-R; the Third Edition of the WAIS-III was published in 1997. Mr. Godsy was administered the Test of Nonverbal Intelligence – Second Edition; the third edition of this measure was published in 1997. Mr. Godsy was administered the WJ-R; the third edition of this measured was administered in 2001. Also Dr. Jacobs provides scores for Mr. Godsy

Page 5
Jennings "Tyson" Godsy
March 21, 2004

based on the administration of the Developmental Test of Visual-Motor Integration. To my knowledge, normative data is only available up to the age of 17 years 11 months on this measure. Mr. Godsy was 27 years 2 months at the time of his evaluation.

Secondly, if the outdated test data were accepted, it is not felt that documentation is sufficient to justify the requested accommodations of extended time and a separate testing room. Although the test data does show below average performance in a number of areas, such as working memory (Digit Span subtest from the WAIS-R), visual-motor integration (Developmental Test of Visual-Motor Integration), spelling (Wide Range Achievement Test – 3), Letter Identification and Word Identification (WJ-R), Dr. Jacobs does not demonstrate that Mr. Godsy has a <u>functional</u> impairment that would require accommodations of extended time and a separate testing room on the USMLE. It is my opinion that a functional impairment must be demonstrated in order to provide a rationale for accommodations. In particular, Mr. Godsy's test results show adequate reading comprehension on the Passage Comprehension subtest from the WJ-R ($SS = 114$, percentile $= 82$). Furthermore, there is no test data that clearly demonstrates a deficit in reading speed or rate, such as poor performance on the Reading Rate subtest from the Nelson-Denny Reading Test (NDRT), poor reading comprehension on the timed Reading Comprehension subtest from the NDRT, or poor reading speed on the Reading Fluency subtest from the WJ-III. In addition, I have not reviewed data that would sufficiently establish an attention problem that would be characterized as a disorder and require the accommodation of a separate testing room for the USMLE.

## SUMMARY:

It is my opinion that additional data and information is needed before the diagnosis of a learning disorder requiring accommodations on the USMLE can be demonstrated. Therefore, there is currently no rationale for accommodations on the USMLE.

Please note these opinions are based on the information available to date. I reserve the right to change or add to these opinions as additional information is made available.

Nancy L. Nussbaum, Ph.D.
Licensed Psychologist
Neuropsychology

NLN:jw