IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED - CLERK
U.S. DISTRICT COURT

2004 MAY 20  PM 4: 29

TX EASTERN-BEAUMONT

BY _____ BC

JENNINGS TYSON GODSY,           §
                                §
          Plaintiff,            §
                                §
VS.                             §          NO. 1:04-CV-00053
                                §
NATIONAL BOARD OF MEDICAL       §
EXAMINERS,                      §
                                §
          Defendant.            §

**DEFENDANT'S SUPPLEMENTAL OPPOSITION TO
PLAINTIFF'S REQUESTED PRELIMINARY INJUNCTION**

TO THE HONORABLE U. S. DISTRICT JUDGE:

Defendant National Board Of Medical Examiners ("Defendant" or "NBME") submits this Supplemental Opposition To Plaintiff's Requested Preliminary Injunction, respectfully demonstrating the following:

**I.**

**INTRODUCTION**

As requested by the Court at the April 8, 2004 preliminary injunction hearing, Defendant's expert, Dr. Nancy Nussbaum reviewed supplemental testing records provided by Dr. Donald Trahan and by Dr. Claire Jacobs, both of whom had previously evaluated Plaintiff at Plaintiff's request. A copy of Dr. Nussbaum's report, prepared following this review, is attached as Exhibit A to this supplemental opposition.

Dr. Nussbaum has concluded that the testing does not demonstrate a need for the accommodations requested by Plaintiff for the Step 1 examination and that the

documentation submitted does not demonstrate a functional impairment in reading. Plaintiff has now proffered all of the documentation that he chose to and that the Court ordered that he produce in support of his claim that he is an individual with a disability. That documentation fails to establish Plaintiff's claim.

The Court is well aware of the heavy burden of proof a movant must meet to secure a preliminary injunction. The Defendant respectfully requests that the Court deny Plaintiff's request for preliminary injunction as Plaintiff has failed to meet his burden of proof.

## II.

## BACKGROUND

On April 12, 2002, Plaintiff submitted a request to NBME to take the United States Medical Licensing Examination ("USMLE") Step 1 with the accommodation of double the standard testing time and a separate room.[1]  Plaintiff submitted the results of evaluations conducted in 1990, 1993, 1999, and 2002 in support of his request for accommodations. The reports of those four evaluations indicated developmental deficits in "written expression." Two of them (1990 and 1993) also indicated developmental deficits in spelling, and the other two referred to "Learning Disability – Not Otherwise Specified." Plaintiff's request was denied because, following expert review, NBME determined that the documentation submitted by Plaintiff did not establish that he is an individual with a disability entitled to accommodations in taking the USMLE.

---

[1] Plaintiff has not pursued his request for a separate room in the court proceedings. His arguments have focused exclusively on his request for extra time in which to take the test.

In July 2003 and November 2003, Plaintiff sat for the Step 1 examination and failed to achieve a passing score on either attempt. Plaintiff did not request accommodations for either of those tests.

On January 26, 2004, over 16 months after his only request for test accommodations was denied by NBME, Plaintiff filed suit with this Court alleging that NBME had violated his rights under the Americans with Disabilities Act ("ADA").[2] At the time of the filing of his complaint, Plaintiff had no pending application for, or request for accommodations in connection with, any Step 1 or Step 2 exam.

On February 16, 2004, within four months of his alleged deadline for passing Step 1, and seventeen months after NBME denied his request, Plaintiff presented himself for another evaluation by a neuropsychologist selected by his attorney. The results of that evaluation, conducted by Dr. Donald Trahan, were not presented to NBME until two days prior to the April 8, 2004 hearing before this Court on Plaintiff's demand for emergency injunctive relief. The report from this evaluation indicated deficits in reading, as well as written expression and spelling. In the limited time available before the hearing, NBME's experts reviewed the report on the February 16, 2004 evaluation submitted by Plaintiff. While it was noted that certain information regarding the evaluation was not included in the report, NBME's expert testified at the hearing that the documentation available did not provide a basis for a determination that Plaintiff suffers from a mental disability that substantially limits him in a major life activity.

Following the hearing, the Court ordered the production of all records relating to the 2002 and 2004 evaluations of Plaintiff by Plaintiff's experts.

---

[2] Defendant was not asked to waive service and was not served until March 10, 2004.

## III.

## DEVELOPMENTS SINCE HEARING

The production of these materials was completed by Plaintiff on April 23, 2004. NBME forwarded the materials to its expert, Dr. Nancy Nussbaum, for review. As more fully discussed in her supplemental report, attached as Exhibit A, these additional materials do not alter Dr. Nussbaum's initial opinion that Plaintiff's documentation is not adequate to establish a diagnosis of a learning disability requiring accommodations on the USMLE.[3]  Dr. Nussbaum has also concluded that the value and utility of further testing is questionable.  In the event additional testing is performed and the results suggest a reading disability, it would be impossible to reconcile those results with existing data to the contrary.  Test results, whose validity and reliability are questionable, cannot be used to document the existence of a reading disability when, as Dr. Nussbaum notes, there exists a wealth of documentation to the contrary.

## IV.

## DOCUMENTATION OF PLAINTIFF'S ALLEGED DISABILITY

The report of the 1990 evaluation performed by the Bridge City Independent School District, when Plaintiff was in tenth grade, noted his Basic Reading skills to be average and his Reading Comprehension to be Above Average.  The only deficits identified as a result of this evaluation were in the areas of spelling and written expression.

The report of the evaluation of Plaintiff conducted by the Bridge City Independent School District in 1993, when Plaintiff was in twelfth grade, references no deficiencies in reading.  It again identifies only deficiencies in written expression and spelling.

---

[3] The May 6 report has been provided to Plaintiff's counsel prior to this filing.

The report of the 1999 evaluation of Plaintiff, conducted by Dr. Tanya Goldbeck, notes limitations in "working memory" and presents a diagnosis of "Learning Disorder, Not Otherwise Specified," as well as a diagnosis of "Disorder of Written Expression."   No functional limitations in reading are identified.

The report of the 2002 evaluation of Plaintiff, conducted by Dr. Claire Jacobs, presents a diagnosis of "Learning Disorder Not Otherwise Specified (visual perception-expressive problems)" based on "history" and also presents a diagnosis "Disorder of Written Expression."

NBME concluded, following review of all of the above-referenced reports by expert consultants, that they did not establish that Plaintiff is an individual with a disability entitled to accommodations.   The bases for that conclusion are set forth in the Affidavit of Joseph Bernier, PhD submitted to the Court, the March 21, 2004 report of Dr. Nussbaum submitted to the Court, the testimony of Dr. Nussbaum at the April 8, 2004 hearing, and the supplemental report of Dr. Nussbaum attached hereto.

None of the individuals who conducted the 1990, 1993, 1999, or 2002 evaluations, which were submitted in support of Plaintiff's request for test accommodations on the USMLE, offered testimony at the April 8 hearing.   Likewise, there was no substantive rebuttal of the opinions of NBME experts that the data reported and Plaintiff's academic history did not support the conclusions reached or the "Learning Disability – NOS" diagnostic label used by Plaintiff's evaluators.   (Even if one assumed for the sake of argument that the diagnoses of Disorder of Written Expression or the deficits in spelling were validated, the functional limitation associated with such diagnoses is not applicable to a

multiple choice test where no skills of written expressive language or spelling are required. There was no dispute of this at the hearing.)

The fact that Dr. Trahan conducted yet another evaluation of Plaintiff in February 2004 and administered additional tests to Plaintiff is consistent with the conclusion that the results of those earlier evaluations did not establish Plaintiff's entitlement to test accommodations on Step 1. It was, however, the results of those evaluations, and not the results of the evaluation conducted by Dr. Trahan after the institution of this action, that were available to NBME at the time it allegedly "illegally refused to accommodate Godsy's disability."

In Dr. Trahan's report, in addition to the deficits in spelling and written expression referenced in the earlier reports, he notes deficits in reading not identified in the four earlier evaluations. Even if the evaluation conducted in 2004 is hypothetically viewed as an appropriate consideration in the context of a legal challenge to a decision rendered in 2002, the results of that recent evaluation do not alter the outcome as those results also fail to establish that Plaintiff has a mental impairment that substantially limits him in a major life activity. As noted in her supplemental report, Dr. Nussbaum has concluded that the evidence presented, including the supplemental testing data provided following the April 8 hearing, demonstrates that Plaintiff's relevant reading abilities are commensurate with those of others his age. As reported by Dr. Nussbaum, Dr. Trahan's conclusion that some accommodations were in order was based on his incorrect comparison of Plaintiff's reading abilities to those of others with comparable education. The correct comparison under the ADA is between Plaintiff and all others of like age in the population, not just with those of comparable education.

# V.

## LEGAL ANALYSIS

To assure the fairness of its examinations and the meaningfulness of scores reported for the examination, NBME alters the standard conditions of USMLE administrations only for individuals who have documented that they are disabled individuals entitled to accommodations under the ADA.  Plaintiff has failed to establish that he is an individual entitled to such accommodations.

In addition to having a physical or mental impairment, to be disabled under the ADA, the individual's impairment must substantially limit one or more of that person's major life activities.  Importantly, pursuant to the Department of Justice's preamble to the regulations it issued implementing Title III, whether a limitation is a "substantial limitation" is evaluated in terms of the general population.  *See Gonzales v. National Board of Medical Examiners*, 225 F.3d 620, 626 (6th Cir. 2000), *cert. denied*, 532 U.S. 1038 (2001).  Specifically, the Department of Justice preamble states that when deciding whether a person is "substantially limited," an analysis is conducted as to whether "the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people."  28 C.F.R., part 36, App. B (West 2003).  *See, also, Price v. National Board of Medical Examiners,* 966 F. Supp. 419, 422 (S.D.W.Va. 1997) (finding that the issue is whether the individual's important life activities are restricted "in comparison to most people in the general population"); *Bercovitch v. Baldwin School, Inc.*, 133 F. 3d 141, 155-56 (1st Cir. 1998) (comparing students to average persons in the general population).

Plaintiff is seeking testing accommodations under §309 of the ADA and the burden is on him to establish that he is a person entitled to the protection of that statutory provision. He has not met that burden. To extend the provisions of that statute to individuals who have not established that they are entitled to its protection would be unfair to other examinees testing under standard conditions, would undermine the principles on which a standardized examination is based, and would minimize the struggles and hardships of the truly disabled.

While not an exact science, like the diagnosis of diabetes through a blood test, the diagnosis of a learning disability is not a subjective endeavor. History of academic performance and psychometric data from evaluation instruments are vital aspects of the diagnostic process. Plaintiff testified at the hearing that he was first diagnosed with some form of a learning disability in his sophomore year of high school. *See*, Hearing Transcript at p. 22 lines 7-14. In fact, Plaintiff's own records indicate that in his sophomore year he was diagnosed with developmental deficits in "*written expression and spelling*" -- not in reading. It was further noted at that time, that Plaintiff's Basic Reading Skills were average (10th grade level) and his Reading Comprehension Skills were deemed Above Average (12th grade level). Plaintiff himself testified that in preparing for his MCAT examination he felt reading comprehension and the physical sciences to be his strengths. *See*, Hearing Transcript at p. 10 lines 17-24. Learning Disabilities are developmental in nature and therefore it is expected that chronic and pervasive difficulties with learning will emerge during childhood. Yet there was no identification of functional limitations in reading in the four evaluations of Plaintiff conducted between 1993 and 2002.

Inquiries under the ADA are fact specific and must examine each individual at the particular point in time when the accommodations are requested. The inquiry must also

focus on the specific activity---in this case, taking the USMLE.  While the Plaintiff's receipt of accommodations for past test-taking may have created expectations on his part, it does not lend any support to his current claim to legal entitlement to accommodations in the context of the medical licensing examination.  No proof was offered regarding the nature of such past tests or the standards used in allowing him test accommodations.

The fact that Plaintiff wants to test under different conditions than other examinees, or believes that he will perform better under such conditions, is not enough to establish legal entitlement to different conditions for the examination.  As pointed out at the hearing, it is ironic that Plaintiff seeks additional time for the upcoming Step 1 since he did not use all of the standard testing time available to him in 2003.  While Plaintiff claims he could have passed the Step 1 if he had had more time, he managed to answer every question on both the July and November examinations without using all of the time allowed him and the other examinees.  In July, 2003, he elected not to use approximately 40 minutes, and in November, 2003, he elected not to use over one hour and 15 minutes, of the testing time available to him.  *See,* Hearing transcript at pages 90 and 91.  *See also,* Defendant's Hearing Exhibit 8.  Plaintiff's 2004 evaluator, Dr. Trahan, testified at the hearing when asked about Plaintiff's use of time on Step 1, that "if the he [Plaintiff] were not utilizing his whole time it would be a significant issue."  *See*, Hearing transcript at p. 65 lines 9-10.

Plaintiff has failed to meet his burden of demonstrating that both the facts and the law clearly favor him.  *See, e.g., Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (facts and law must clearly favor the moving party).  Indeed, Plaintiff has failed to meet his burden of proof on <u>any</u> of the four required elements that must <u>each</u> be satisfied to entitle him to the relief sought.  *See, e.g., Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 917

(5th Cir. 2000). If even one of the elements is unsatisfied, the preliminary injunction must be denied. *Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990).

Further, since Plaintiff is actually seeking to alter the *status quo*, rather than just maintaining it, he must meet the even more exacting heightened standards for a mandatory preliminary injunction. He must demonstrate clear entitlement to relief. *See, Justin Indus., Inc. v. Choctaw Sec., L.P.*, 747 F.Supp. 1218, 1220 (N.D. Tex. 1990), *aff'd*, 920 F.2d 262 (5th Cir. 1990).

Plaintiff has failed to clearly demonstrate a "substantial likelihood of success on the merits." Plaintiff has not produced evidence clearly establishing that he has a learning or other disability entitling him to any accommodations on Step 1. The testing data which Plaintiff has provided demonstrates, in contrast, that he is not substantially impaired in any major life activity relevant to Step 1.

Further, Plaintiff cannot demonstrate a "substantial threat of irreparable injury." His alleged injury is that failing the Step 1 a third time will delay or end his medical education. (This alleged outcome is reportedly related to policies of Plaintiff's medical school and not policies of the NBME. *See*, Hearing transcript at p. 25 lines 7-14.) On the two prior occasions when he took the Step 1, Plaintiff did not submit requests for test accommodations. While he claims that, without additional testing time, he will fail the examination a third time, there is no evidence in the record establishing that testing with the standard amount of time contributed to his prior failures. It is difficult to understand how Plaintiff can argue that he will be injured by not having more testing time on Step 1 when he did not use all of the standard testing time available to him on prior unsuccessful attempts. While a third failure

on Step 1 may have negative consequences for Plaintiff, there is a dearth of evidence linking that speculative harm to actions on the part of NBME.

Moreover, to the extent that Plaintiff argues that not allowing him extra accommodations to take the test in May 2004 would further delay his medical education, Plaintiff has knowingly placed himself in that position by waiting over sixteen months from the September 2002 denial of accommodations to pursue this matter in court. Notwithstanding his claims of imminent harm and need for emergency relief, Plaintiff has not yet even applied for the Step 1 that he alleges he must take and pass this month. Providing extended testing time to an examinee who has not established that he is entitled to such an accommodation under the ADA harms NBME, which utilizes standardized conditions for USMLE test administration to assure the meaningfulness of the scores it reports for its examinations.

Finally, Plaintiff has presented no evidence at all that granting the extra time allotments which he has requested will <u>not</u> undermine or disserve the public interest.  To the contrary, the only evidence presented in that regard was presented by the Defendant and clearly showed that granting unjustified accommodations would devalue the examination and would be unfair to similarly situated examinees who are not given the benefit of extra time, but who are being evaluated using the same standards as Plaintiff.  Plaintiff seeks the benefit of preferential treatment, not equal treatment, since he has no entitlement to unnecessary extra time to take the Step 1 test.

As the court found in *Price v. National Board of Medical Examiners*, if a court grants accommodations to those who are not disabled under the ADA, it would be allowing them to advance through the "proverbial back door."  To do so would subvert the integrity of the

USMLE and hinder the ability of NBME to distinguish between qualified and unqualified examinees. *Price*, at 422.

## VI.

## CONCLUSION

Plaintiff bears the burden of establishing that he is a disabled individual under the ADA entitled to accommodations pertaining to the Step 1 USMLE.  Plaintiff has not satisfied this burden, nor has Plaintiff met his heavy burden of establishing entitlement to injunctive relief.  Therefore, Plaintiff's request for injunctive and all other relief must be denied.

Respectfully submitted,

MEHAFFYWEBER, P.C.
Attorneys for Defendant

By _____
ELIZABETH B. PRATT, Of Counsel
State Bar No. 16239450

Post Office Box 16
Beaumont, Texas  77704
Telephone:  (409) 835-5011
Telecopier:  (409) 835-5177

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded via certified mail, return receipt requested to the following on this the ____20____ day of May, 2004:

Mr. Kenneth W. Lewis
Mr. Jeffrey Roebuck
Bush, Lewis & Roebuck, P.C.
1240 Orleans Street
Beaumont, Texas  77701

_____
ELIZABETH B. PRATT

MAY   7 2004

# AUSTIN NEUROLOGICAL CLINIC FOUNDED 1970

OFFICE:      711 WEST 38TH STREET, BLDG. F., AUSTIN, TEXAS 78705 (512) 458-6121
MAILING:     P.O. BOX 300669, AUSTIN, TEXAS 78703
FAX:         (512) 452-5567 BUSINESS
FAX:         (512) 452-9171 HEALTH CARE

NEUROLOC
J. DOUGLAS HUDSON, M.
ALBERT B. HORN, III, M.
MICHAL A. DOUGLAS, M.
MICHAEL G. HUMMER, M.
DAVID W. MORLEDGE, M.
KENT T. ELLINGTON, M.

ASSOCIA
NANCY CHILDS, M.I

NEUROPSYCHOLOC
DAVID R. STEINMAN, Ph.I
NANCY L. NUSSBAUM, Ph.I
DAVID M. TUCKER, Ph.I
MELISSA R. BUNNER, Ph.I

ADMINISTRATC
MARCENA SORREL

## ATTORNEY WORK PRODUCT, PRIVILEGED AND CONFIDENTIAL

May 6, 2004

### UPDATE OF MARCH 2, 2004 REPORT

Ms. Suzanne Williams
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Re:   Mr. Jennings "Tyson" Godsy

Dear Ms. Williams:

The following report is an update to the Review of Records Report of March 21, 2004.
Since that time, I have also reviewed the Neuropsychological Report by Dr. Donald E.
Trahan from February 16, 2004, all standard scores, raw scores, and protocols from Dr.
Trahan's assessment of Mr. Godsy, and test protocols from the Neuropsychological
Update by Dr. Claire E. Jacobs from February 6 – April 12, 2002.

The following analysis is based on a review of previous and current records.  As
indicated in the previous report, it is important to note that my opinions are not meant to
diagnosis Mr. Godsy.  These opinions are based on a review of records, and I did not
conduct an interview or evaluation with Mr. Godsy.  The purpose of the review is to
address the adequacy of Mr. Godsy's records to document the diagnoses and rationale for
accommodations requested, and to determine whether this documentation meets the
standards of the Americans With Disabilities Act.

After reviewing all of the previous and current records, it continues to be my opinion that
Mr. Godsy's documentation is not adequate to establish a diagnosis of a learning
disability requiring accommodations on the USMLE.  Specifically, I was looking for
documentation that supported the diagnosis of a reading disorder, as this would be the
type of learning disability that would provide a rationale for the accommodation of
extended time that has been requested for the USMLE.  In my review of the previous and
current records, I have not found sufficient documentation to support a diagnosis of a
reading disorder that would justify accommodations on the USMLE.

**EXHIBIT A**

Page 3
Jennings "Tyson" Godsy
May 6, 2004

1. Criterion - Reading Achievement Substantially Below Chronological Age, Intelligence, Education

Mr. Godsy's documentation does not show that his reading achievement is substantially below his chronological age. When age based norms are used to score Mr. Godsy's reading achievement, his reading scores are all greater than the 25th percentile (Table 2). Conventionally, the 16th or 25th percentile is often used as the lower end of the average range, below which impairment is demonstrated. The 16th percentile represents 1 standard deviation below the mean. The 25th percentile is recognized as the more liberal cutoff.

Mr. Godsy documentation does show reading achievement, as measured by an individually administered standardized test of reading accuracy (Word Identification) and reading comprehension (Passage Comprehension), which is substantially below that expected given his measured intelligence. This finding is noted when age-based norms are used for both the WRMT-R and the WAIS-R, WAIS-III (Table 2 & 3). It should be noted that the term "substantially below" is interpreted in this situation as a discrepancy of $\geq$ one standard deviation (15 standard score points). This is a fairly liberal interpretation of the term "substantial difference," in that many others in the field would require a 1.5 to 2 standard deviation difference to demonstrate a substantial discrepancy. In fact, the DSM-IV states, "*Substantially below* is usually defined as a discrepancy of more than 2 standard deviations between achievement and IQ".

2. Criterion - Significant Interference With Academic Achievement of Activities of Daily Living

In criteria two, we are looking for documentation that shows a functional impairment in reading, especially as related to the USMLE and the requested accommodation of extended time. In this context, functional impairment refers to a deficit as demonstrated by below-average performance on measures of reading achievement. As noted in number 1 above, the 25th percentile is often used as the lower end of the average range, below which a functional impairment is demonstrated.

In this particular situation, we are looking for data showing a deficit in reading comprehension and/or reading speed, where Mr. Godsy's performance is at least below the 25th percentile. If other criteria were also met, this would suggest a disability that would require the accommodation of extended time on the USMLE.

Mr. Godsy's school group achievement testing presented in Table 1 shows all reading achievement clearly above the 25th percentile. Similarly, reading achievement as measured in individual psychoeducational assessment shown in Table 3 indicates Mr. Godsy's performance is above the 25th percentile when age-based norms are utilized.

In summary, it does not appear that Mr. Godsy has a functional impairment in reading that would be described as a disability requiring the accommodation of extended time on the USMLE. It is my opinion that a functional impairment must be demonstrated in order to substantiate a disability and provide a rationale for accommodations.

Page 4
Jennings "Tyson" Godsy
May 6, 2004

3. Criterion—Sensory Deficits

Mr. Godsy's documentation does not indicate any known sensory deficits. In any case, this criterion is not relevant, as it is my opinion that Mr. Godsy's documentation is not sufficient to substantiate a reading disorder in the first place.

In summary, although Mr. Godsy's achievement, as measured by an individually administered standardized test of reading, is substantially below that expected given his measured intelligence, the disturbance in academic functioning is not felt to significantly interfere with activities of daily living that require these skills. Even though Mr. Godsy's scores on the Word Identification and the Passage Comprehension subtests from the WRMT-R were significantly below his ability level, they were not substantially below the average person in the population. Based on the data that I have been provided, I do not feel that Mr. Godsy's disturbance or discrepancy in academic skills could be described as a disability.

**ADDITIONAL EVALUATION:**

The issue of additional testing was raised at the time of the hearing in early April. Certainly it was my opinion then (and now) that additional test data and information was needed before the diagnosis of a learning disorder requiring accommodations on the USMLE could be clearly demonstrated. The question is whether or not reliable and valid test results could be obtained in further testing. The validity and reliability of additional testing would be questionable because of possible conscious or unconscious bias in the examinee created by the circumstances. The USMLE is an extremely high-stakes test that would create a great deal of pressure on any examinee, especially one who has previously been unsuccessful at passing this test.

In addition, through the deliberations carried out thus far, it would be very apparent to Mr. Godsy the type of test results on a measure of reading achievement that would be required to demonstrate a reading disorder. These tests are very transparent as to the skill or domain that they are measuring. It is my opinion that this type of information could easily bias any individual's performance on these types of measures. There already is some question in my mind as to why Mr. Godsy's test performance declined from the 84th percentile on the Passage Comprehension subtest from the WRMT-R administered by Dr. Jacobs in 2002 to the 37th percentile on the same measure administered by Dr. Jacobs in 2004 (see Table 2). This decline could be due to unusual measurement error, examiner's administration error, or examinee bias. Of the reading measures administered, the Passage Comprehension subtest would be the most relevant to the requested accommodations on the USMLE.

Page 4
Jennings "Tyson" Godsy
May 6, 2004

3.   Criterion—Sensory Deficits

Mr. Godsy's documentation does not indicate any known sensory deficits. In any case, this criterion is not relevant, as it is my opinion that Mr. Godsy's documentation is not sufficient to substantiate a reading disorder in the first place.

In summary, although Mr. Godsy's achievement, as measured by an individually administered standardized test of reading, is substantially below that expected given his measured intelligence, the disturbance in academic functioning is not felt to significantly interfere with activities of daily living that require these skills. Even though Mr. Godsy's scores on the Word Identification and the Passage Comprehension subtests from the WRMT-R were significantly below his ability level, they were not substantially below the average person in the population. Based on the data that I have been provided, I do not feel that Mr. Godsy's disturbance or discrepancy in academic skills could be described as a <u>disability</u>.

## ADDITIONAL EVALUATION:

The issue of additional testing was raised at the time of the hearing in early April. Certainly it was my opinion then (and now) that additional test data and information was needed before the diagnosis of a learning disorder requiring accommodations on the USMLE could be clearly demonstrated. The question is whether or not reliable and valid test results could be obtained in further testing. The validity and reliability of additional testing would be questionable because of possible conscious or unconscious bias in the examinee created by the circumstances. The USMLE is an extremely high-stakes test that would create a great deal of pressure on any examinee, especially one who has previously been unsuccessful at passing this test.

In addition, through the deliberations carried out thus far, it would be very apparent to Mr. Godsy the type of test results on a measure of reading achievement that would be required to demonstrate a reading disorder. These tests are very transparent as to the skill or domain that they are measuring. It is my opinion that this type of information could easily bias any individual's performance on these types of measures. There already is some question in my mind as to why Mr. Godsy's test performance declined from the 84th percentile on the Passage Comprehension subtest from the WRMT-R administered by Dr. Jacobs in 2002 to the 37th percentile on the same measure administered by Dr. Jacobs in 2004 (see Table 2). This decline could be due to unusual measurement error, examiner's administration error, or examinee bias. Of the reading measures administered, the Passage Comprehension subtest would be the most relevant to the requested accommodations on the USMLE.

Page 5
Jennings "Tyson" Godsy
May 6, 2004

**SUMMARY:**

Unfortunately, we do not have the most thorough database on which to make a judgment regarding the accuracy of the diagnosis of a reading disorder that would require accommodations on the USMLE. However, there is a wealth of documentation (see Table 1 and 3) that does not clearly support this diagnosis and requested accommodations on the USMLE.

Nancy L. Nussbaum, Ph.D.
Licensed Psychologist
Neuropsychologist

NLN:jw

# Table 1
## Godsy Standardized Test Results in Reading

| Grade | Test | Results |
|---|---|---|
| K | Science Research Associates (SRA) | Composite Reading National Percentile = 80% |
| 1st | Science Research Associates (SRA) | Composite Reading National Percentile = 74% |
| 2nd | Science Research Associates (SRA) | Composite Reading National Percentile = 58% |
| 6th | Science Research Associates (SRA) | Reading Comprehension = 94% |
| 7th | Metropolitan Achievement Tests (MAT)6 | Reading Comprehension 80 Percentile Rank Grade Equivalent =12.1 |
| 7th | Texas Educational Assessment of Minimum Skills (TEAMS) | Scaled Score in Reading = 882 Demonstrated Mastery of Grade 6 Reading Competencies |
| 9th | Metropolitan Achievement Tests (MAT)6 | Reading Comprehension = 99% |

## TABLE 2

### Comparison of WAIS-R and WAIS-III Data

| WAIS | Bridge City WAIS-R 1993 (SS) | Dr Jacobs WAIS-R 2002 (SS) | Dr Trahan WAIS-III 2004 (SS) |
|---|---|---|---|
| Verbal IQ | 119 | 99 | 114 |
| PIQ | 105 | 126 | 114 |
| Full IQ | 114 | 110 | 115 |

# TABLE 3
## Woodcock Johnson Reading Mastery Test Comparison

| Woodcock Johnson Reading Mastery | Dr Jacobs 2002 Standard Score | Dr Jacobs 2002 PR | Dr Trahan 2004 Standard Score | Dr Trahan 2004 PR |
|---|---|---|---|---|
| Word Identification | 93 | 33rd | 93 | 32nd |
| Word Attack | 108 | 71st | 105 | 63rd |
| Word Comprehension | 114 | 66th | N/G | N/A |
| Passage Comprehension | 115 | 84th | 95 | 37th |