FILED - CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

2004 JUN 15 PM 3: 55

TX EASTERN-BEAUMONT

| | | |
|---|---|---|
| JENNINGS TYSON GODSY, | § | |
| Plaintiff, | § | |
| | § | BC |
| v. | § | Civil Action No. 1:04-CV-53 |
| NATIONAL BOARD OF MEDICAL | § | BY_____ |
| EXAMINERS, | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION TO SUPPLEMENT RECORD FOR PRELIMINARY INJUNCTION

Plaintiff, JENNINGS TYSON GODSY ("GODSY"), files this Motion to Supplement

the Record in Support of Plaintiff's Motion for Preliminary Injunction, and showing the Court

as follows:

### I. Background

1.      Godsy is a fourth year medical student at the University of Texas Medical

School (the "Medical School") in San Antonio, Texas. Previous records and testimony

show that throughout his public school education in the Bridge City Independent School

District he routinely tested above average on standardized intelligence tests and, though

a well behaved and diligent student, by junior high school his parents and teachers had

noted a significant difficulty with spelling and written expression and some deficits in

reading comprehension. Diagnostic testing eventually provided some understanding and

relief to Godsy and his parents when it was concluded during his tenth grade year that

even though he can comprehend, retain and apply complex information, he has a learning

disorder related to the way or rate that he processes information that causes deficits in

reading, written expression, and spelling. This information, as confirmed by subsequent

independent testing outside the public school system, led to an understanding of Godsy's

difficulties regarding timed examinations and he was granted accommodations in high school in the form of extra time and a separate testing room. While completing his engineering degree in college, he again overcame the limitations of his disability through accommodations from his instructors of extra time on time limited tests. The Medical School has provided Godsy with the reasonable accommodation of additional time on exams taken to date in medical school. State and national agencies or boards administering the following tests have considered Godsy's disability and granted accommodations (with which Godsy has successfully passed the tests):

    a.    1993 – TASS;

    b.    1995 – SAT;

    c.    1997 – Post-Graduate Fundamentals of Engineering Exam;

    d.    1998 – Dental Admission Test; and

    e.    1997 and 1999 – Medical College Admission Test.

With the accommodations, Godsy successfully completed his courses for the first three years and he requested accommodations for his learning disabilities under the Americans with Disabilities Act when he initially applied to the NBME to take the Step 1 test. The NBME denied his request and refused to accommodate Godsy's disability. Because the NBME denied his request, Godsy was required to take the exam without accommodations and did not pass. Godsy applied for and took the examination a second time without accommodations and again failed to pass the exam. Under the Medical School guidelines, Godsy is only allowed one more opportunity to take the Step 1 test. The NBME is the single state or national board or agency to fail to acknowledge Godsy's learning disability and provide ADA accommodations to him to take its time limited exam. This lawsuit was

filed as a last result by Godsy, seeking accommodations from the NBME for USMLE Step 1 exam in the form of additional time to take the test and asking the Court to enter a preliminary injunction prohibiting the NBME for continuing its refusal to allow these accommodations so that Godsy can successfully complete the requirements to timely begin his next year of medical school–an option quickly sliding away.

2. An evidentiary hearing on Godsy's petition for a preliminary injunction was held on April 8, 2004, at which the most recent neuropsychologist (Dr. Donald Trahan) to interview, test and evaluate Godsy testified as to his findings confirming the diagnosis of an information processing learning disability and the need for an accommodation in the form of at least an additional 50% to take the time limited USMLE Step 1 exam for Godsy. Defendant NBME provided testimony from numerous witnesses, including its own retained neuropsychologist (Dr. Nancy L. Nussbaum) who neither interviewed, examined or otherwise personally evaluated Godsy nor sought to do so but rather testified that without the underlying testing data from Dr. Trahan's testing she could not determine whether or not Godsy had the claimed disability. At the Court's suggestion, Godsy agreed to have Dr. Trahan produce the underlying data and even volunteered to submit to additional testing by Dr. Nussbaum or specialist of her own choosing. Dr. Trahan's data was promptly produced. NBME then requested that Godsy procure and provide to it the underlying testing data from yet another neuropsychologist (Dr. Claire E. Jacobs), whom the medical school had suggested Godsy see when he was originally applying for the USMLE Step 1 testing accommodations. Godsy again complied with the NBME's request.

3. Dr. Nussbaum subsequently issued a report purportedly based on this additional information, which has been supplied to the Court with additional briefing by

Defendant NBME. In response, Dr. Trahan also prepared a subsequent report, a copy of which has been supplied to the Court along with Plaintiff Godsy's supplemental brief. This motion respectfully asks the Court to take judicial notice of those two documents and an additional two documents included with this motion and to allow all four documents to serve as supplements or additions to the record of the prior hearing on Godsy's Petition for Temporary Injunction.

## II. Supplementation

4.      Godsy moves that the Court accept the following documents as supplements and additions to the record of the April 8, 2004, hearing:

a.      Dr. Nancy L. Nussbaum's May 6, 2004, update (attached hereto and incorporated by reference as Exhibit 1);

b.      Dr. Donald E. Trahan's May 14, 2004, followup neuropsychological report (attached hereto and incorporated by reference as Exhibit 2);

c.      Dr. Leonard E. Lawrence's June 9, letter as Associate Dean for Student Affairs at the University of Texas Health Science Center at San Antonio (the Medical S chool h erein) e xplaining t he s chool p olicy o n t he n ecessity o f passing the USMLE Step 1 examination before beginning the fourth year of medical school; (attached hereto and incorporated by reference as Exhibit 3); and

d.      UTHSCSA Catalog 1999-2004, pages 1-4 (numbered 152-155) for Medical School, explaining on page 3 (numbered 154) the maximum of three attempts to pass the USMLE Step 1 exam (attached hereto and incorporated by reference as Exhibit 4).

## III. Dr. Nussbaum's Report

5.      Dr. Nussbaum's new May 6 update report, as well as her previous report and testimonial opinions, must be placed in the appropriate context of exactly what it does and does not represent. On the very first page of the new report, Dr. Nussbaum notes:

> As indicated in the previous report, it is important to note that my opinions are not meant to diagnosis Mr. Godsy. These opinions are based on a review of the records, and I did not conduct an interview or evaluation of Mr. Godsy. The purpose of the review is to address the adequacy of Mr. Godsy's records to document the diagnoses and rationale for the accommodations requested, and to determine whether this documentation meets the standards of the Americans With Disabilities Act.
>
> After reviewing all the previous and current records, it continues to be my opinion that Mr. Godsy's documentation is not adequate to establish a diagnosis of a learning disability requiring accommodations on the USMLE. . . . In my review of the previous and current records, I have not found sufficient documentation to support a diagnosis of a reading disorder that would justify accommodations on the USMLE.

Dr. Nussbaum then undertakes a statistical analysis which is not part of the ADA criteria. Under the ADA, the term disabled is applied to anyone who is below the 50th percentile when compared to the population at large. Dr. Nussbaum engages in an interesting analysis when she turns to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (commonly called the DSM-IV) and quotes its discussion of substantial discrepancy, noting that the DSM-IV states "Substantially below is usually defined as a discrepancy of more than 2 standard deviations between achievement and IQ." She offers no explanation of what that has to do with anything in this case or the ADA in general. In fact, the DSM-IV has nothing to do with legal standards. The Cautionary Statement at page xxvii of the DSM-IV emphatically notes:

> The purpose of DSM-IV is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a

> diagnostic category . . . does not imply that the condition meets
> legal or other nonmedical criteria for what constitutes mental
> disease, mental disorder, or mental disability. The clinical and
> scientific considerations involved in categorizations of these
> conditions as mental disorders may not be wholly relevant to
> legal judgments, for example, that take into account such
> issues as individual responsibilities, disability determination,
> and competency.

In the DSM-IV "Introduction" at page xxiii there is a strong warning about its use in forensic

settings:

> When the DSM-IV categories, criteria, and textual descriptions
> are employed for forensic purposes, there are significant risks
> that diagnostic information will be misused or misunderstood.
> These dangers arise because of the imperfect fit between the
> questions of ultimate concern to the law and the information
> contained in a clinical diagnosis. In most situations, the clinical
> diagnosis of a DSM-IV mental disorder is not sufficient to
> establish the existence for legal purposes of a "mental
> disorder," "mental disability," "mental disease," or "mental
> defect." In determining whether an individual meets a
> specified legal standard . . . , additional information is usually
> required beyond that contained in the DSM-IV diagnosis. This
> might include information about the individual's functional
> impairments and how these impairments affect the particular
> abilities in question. It is precisely because impairments,
> abilities, and disabilities vary widely within each diagnostic
> category that assignment of a particular diagnosis does not
> imply a specific level of impairment or disability.

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-VI at xxvii and xxiii (4th

Ed.) These caveats would certainly give strong reason to at least pause before giving

strong weight to DSM-IV criteria in this case, particularly in view of the fact

that no reference to it or its criterial appear anywhere in the ADA.

6.    Dr. Nussbaum then concludes the first portion of consideration of disability

with the somewhat ambiguous statement: "Based on the data that I have been provided,

I do not feel that Mr. Godsy's disturbance or discrepancy in academic skills could be

described as a <u>disability.</u>" What is clear is that Dr. Nussbaum recognizes that Godsy has

"disturbances or discrepancies" in academic skills. She simply does not explain what they

are or how she might classify or quantify them.

       7.      In the conclusion to her report, Dr. Nussbaum observes:

> Unfortunately, we do not have the most thorough database on which to make a judgment regarding the accuracy of the diagnosis of a reading disorder that would require accommodations on the USMLE. However, there is a wealth of documentation (see Table 1 and 3) that does not clearly support this diagnosis and requested accommodations on the USMLE.

Interestingly, Dr. Nussbaum chooses carefully the data she includes in her tables and the

diagnosis she contests, yet never says there is not disability, only that "there is a wealth

of documentation that does not clearly support this diagnosis and requested

accommodations on the USMLE." This is not the applicable more likely than not standard

of the preponderance of the evidence required in this case. Even more interesting are Dr.

Nussbaum's closing remarks implying that the database is insufficient when compared to

her two immediately preceding paragraphs under the title "Additional Evaluation." Those

two paragraphs strongly urge that any additional testing would not be unreliable because

it would be apparent to the test taker that doing poorly would be beneficial and it would be

easier to determine from the tests how to do poorly in reading. In other words, no test giver

could determine how to eliminate tester bias–in the opinion of Dr. Nussbaum. This

surprisingly means that there is no way to gain the additional data that she notes in her

next section is missing from the analysis. Equally interesting is the fact that she compares

the test results of Dr. Jacobs in 2002 to those of Dr. Jacobs in 2004 (apparently really

meaning to say Dr. Trahan since it was Trahan and not Jacobs who tested Godsy in 2004)

and notes the dramatic decline between the two testing dates. Dr. Nussbaum now relies on Dr. Jacobs's test results because in this instance they support her position but in courtroom testimony she was severely critical of Dr. Jacobs for the version of the tests she selected to give to Godsy.

8.     The main criticism of Dr. Nussbaum's written and oral opinions, however, are that they totally fail to address the disabilities with which Godsy has been diagnosed and based upon which he seeks accommodations. The diagnosis of Dr. Trahan was DSM–IV 315.9–Learning Disorder Not Otherwise Specified, with deficits in reading, written expression and spelling. This same diagnosis was made in April 2002 by Dr. Claire Jacobs, the only other neuropsychologist to interview, examine and test Godsy. Dr. Jacobs noted that "timed tests will not provide a valid measure of Mr. Godsy's knowledge of test material." Dr. Nussbaum does an excellent job of disproving the non-diagnosis of 315.00–Reading Disorder. Dr. Nussbaum does not address Dr. Trahan's February 16, 2004 opinion that his findings were consistent with mild dyslexia. Equally important, Dr. Nussbaum never discusses the extensive educational testing done by local noted educational diagnostician Tanya Goldbeck in 1999 prior to Godsy taking the MCAT and applying to medical school. Her testing also resulted in a diagnosis of 315.9–learning disorder not otherwise specified. More importantly, her supplemental report on March 22, 1999, further described the disability as an output learning disability. Her materials described it as a visual perception disturbance and discussed in detail the need to provide the student extra time to be able to reproduce data that has been learned. Goldbeck described this memory processing problem as a delay in retrieval process whereby: "a delay occurs in memory retrieval that keeps him from pulling forth factual information with

ease. . . . [G]iven extended time, he can rely more on his visualization process to retrieve data." In fact, Goldbeck specifically measured the deficit in processing speed as being only in the 27th percentile and working memory as in the 40th percentile. When charting past evaluations, Goldbeck's analysis deserves as least mention in any analysis claimed as objective.

9.      For all of these reasons, Dr. Nussbaum's May 6, 2004, updated report should be made part of the record.

## IV. Dr. Trahan's Report

10.      After reviewing Dr. Nussbaum's May 6 updated report, Dr. Trahan asked to be allowed to write a response. In his report, Dr. Trahan takes great issue with Dr. Nussbaum's attempts to refute 14 years of learning disability diagnoses on Godsy's problems. He notes that guidelines for both the American Psychological Association and forensic psychological specialists explicitly recognize the clear limitations on the validity of conclusions drawn from a record review alone without a patient examination. As mentioned previously, the American Psychiatric Association's DSM-IV also confirms this limitation and even Dr. Nussbaum tacitly acknowledges it in her care to be very clear about not making a diagnosis in her reports. Dr. Trahan then proceeds to carefully document the gross inaccuracy of Dr. Nussbaum's description of the past testing records on Godsy, the most telling of which were those from the Bridge City public school system before ADA accommodations were even a blip on the radar screen. Even the Texas public school system recognized that Godsy had a learning disability–based on very strong data–long before he got to medical school.

11.      Dr. Trahan carefully discusses the fact that Dr. Nussbaum totally ignores the

issues of Godsy's deficits in reading speed and information processing.  Dr. Jacobs noted the slow reading speed.  Dr. Trahan directly measured the rate of information processing in his testing and the scores showed clear deficits in rate of information processing, within the moderately impaired range.  He additionally showed considerable slowness on the Woodcock-R Passage Comprehension Subtest.  Dr. Trahan further notes that his opinions are based upon his examination and testing of Godsy and his review of reports from multiple other clinicians who personally examined Godsy over the last 14 years and that the only person disputing the learning disability diagnosis is Dr. Nussbaum.  As Dr. Trahan so strongly notes, multiple scores reflect that Godsy's performance in reading, writing, and spelling is below the 16th percentile.

12.     Dr. Trahan summarizes his opinions by noting that it is the slowness in reading and information processing that more than any other deficit warrants an extension of time on the USMLE Step 1 exam and such an accommodation is both reasonable and appropriate for the documented deficit.  This rebuttal to Dr. Nussbaum is an essential piece of evidence that should be a supplement to the original record.

### V.  Associate Dean Lawrence's Letter and UTHSCSA Catalog

13.     To the surprise of Godsy and his counsel at the April 8, 2004, hearing in this matter that Defendant NBME contested that there was any urgency in getting a ruling in this case and then contested Godsy's testimony about the Medical School's policy on a time and number limitation on taking the Step 1 exam, actually claiming that there was no deadline or limit for a medical school student to take Step 1 and 2 exams.  The Medical School Associate Dean Leonard E. Lawrence succinctly describes and quotes the portion of the school catalog clearly confirming the contentions of Godsy that he must pass the

Step 1 exam before being permitted to begin his fourth year of medical school and that students are only permitted three attempts to pass the exam, with a third failure resulting in dismissal from school. The school catalog in effect when Godsy enrolled further verifies that this has been the policy throughout his medical school career. Inclusion of Supplemental Exhibits 3 and 4 remove any question of the urgency of the need for the issuance of a preliminary injunction by the Court.

### VI. Conclusion

14.     The four aforementioned and discussed exhibits are critical to create a full record of what transpired at and as a result of the April 8, 2004, hearing on Plaintiff Godsy's Petition for a Temporary Injunction so that all the documentation and opinions of the key witnesses is fully preserved. Essentially, the only arguments put forth by the NBME against granting the accommodations of additional time to Godsy to take the exam are that he is not disabled as that term is defined under the ADA in the context of professional licensing exams and that he does not need the additional time both because he has no disability with which additional time will help and this exam is a knowledge based exam on which additional time does not help. The argument on the disability fails on the strength of the record. The response to the second reason's two rationales is obvious. If this test if really over knowledge, additional time is not a problem: If Godsy has no disability and simply does not know the material, he will fail. If he has a disability and does not know the material, he will still fail. If, however, he does have a disability and knows the material, he will pass and both the ADA and the USMLE will have functioned properly.

15.     With this additional documentation, the only reasonable conclusions from the record are that:

a.   Godsy has a disability under ADA guidelines and law that requires additional time to take the NBME USMLE Step 1 tests as a reasonable accommodation of his learning disability;

b.   The NBME is violating the ADA by refusing to provide the reasonable accommodation to Godsy of additional time to take the USMLE Step 1 Test;

c.   Time is of the essence because each passing day without being allowed to take the test with the accommodations results in harm to Godsy in that he can neither prepare for and begin his fourth year of medical school nor take the appropriate steps to secure a residency and is further removed from the academic stimulus of medical school so that an emergency exists necessitating an immediate temporary injunction;

d.   Without the extraordinary remedy of injunctive relief, Godsy will suffer irreparable injury and lose any ability to ever obtain meaningful relief, including any actual protection authorized and guaranteed under the ADA;

e.   There is a substantial likelihood Godsy will prevail on the merits of his claim at trial;

f.   The threatened injury to Godsy outweighs any potential harm to the NBME; and

g.   The injunction will not be adverse to the public interest.

### VII. Prayer

Godsy requests that this Court grant his request to supplement the record by accepting the proffered Exhibits 1, 2, 3 and 4, and, that after such addition to the record, the Court immediately grant the pending request for a preliminary injunction directing that the NBME immediately cease and desist from its refusal to accommodate Godsy's request for reasonable accommodations on the USMLE Step 1 examination and ordering that the NBME immediately comply with the ADA by allowing Godsy the requested accommodation of double the standard time in which to take the USMLE Step 1 examination; and then the Step 2 examination, awarding such other and further relief as may be appropriate, in law or in equity, to which Godsy may otherwise by entitled.

Respectfully submitted,

BUSH, LEWIS & ROEBUCK, P.C.
1240 Orleans Street
Beaumont, Texas 77701
409/835-3521
409/835-4104 (Fax)

By: _____
       Kenneth W. Lewis, Attorney in Charge
       Texas Bar #12295300
       Jeffrey T. Roebuck, Of Counsel
       Texas Bar #24027812

ATTORNEYS FOR PLAINTIFF
JENNINGS TYSON GODSY

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a true and correct copy of the above and foregoing document has been furnished to all counsel of record by hand delivery on this the 15th day of June, 2004.

Elizabeth B. Pratt                     **VIA HAND DELIVERY**
Mehaffy Weber, P.C.
2615 Calder, Suite 800
Beaumont, TX 77702

_____
Kenneth W. Lewis

MAY  7 2004

# AUSTIN NEUROLOGICAL CLINIC FOUNDED 1970

OFFICE:     711 WEST 38TH STREET, BLDG. F., AUSTIN, TEXAS 78705 (512) 458-6121
MAILING:    P.O. BOX 300669, AUSTIN, TEXAS 78703
FAX:        (512) 452-5567 BUSINESS
FAX:        (512) 452-9171 HEALTH CARE

NEUROLOGY
J. DOUGLAS HUDSON, M.
ALBERT B. HORN, III, M.
MICHAL A. DOUGLAS, M.
MICHAEL G. HUMMER, M.
DAVID W. MORLEDGE, M.
KENT T. ELLINGTON, M.

ASSOCIA
NANCY CHILDS, M.

NEUROPSYCHOLOG
DAVID R. STEINMAN, Ph.
NANCY L. NUSSBAUM, Ph.
DAVID M. TUCKER, Ph.
MELISSA R. BUNNER, Ph.

ADMINISTRATC
MARCENA SORRE

## ATTORNEY WORK PRODUCT, PRIVILEGED AND CONFIDENTIAL

May 6, 2004

### UPDATE OF MARCH 2, 2004 REPORT

Ms. Suzanne Williams
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Re:    Mr. Jennings "Tyson" Godsy

Dear Ms. Williams:

The following report is an update to the Review of Records Report of March 21, 2004. Since that time, I have also reviewed the Neuropsychological Report by Dr. Donald B. Trahan from February 16, 2004, all standard scores, raw scores, and protocols from Dr. Trahan's assessment of Mr. Godsy, and test protocols from the Neuropsychological Update by Dr. Claire E. Jacobs from February 6 – April 12, 2002.

The following analysis is based on a review of previous and current records. As indicated in the previous report, it is important to note that my opinions are not meant to diagnosis Mr. Godsy. These opinions are based on a review of records, and I did not conduct an interview or evaluation with Mr. Godsy. The purpose of the review is to address the adequacy of Mr. Godsy's records to document the diagnoses and rationale for accommodations requested, and to determine whether this documentation meets the standards of the Americans With Disabilities Act.

After reviewing all of the previous and current records, it continues to be my opinion that Mr. Godsy's documentation is not adequate to establish a diagnosis of a learning disability requiring accommodations on the USMLE. Specifically, I was looking for documentation that supported the diagnosis of a reading disorder, as this would be the type of learning disability that would provide a rationale for the accommodation of extended time that has been requested for the USMLE. In my review of the previous and current records, I have not found sufficient documentation to support a diagnosis of a reading disorder that would justify accommodations on the USMLE.

EXHIBIT

1

Page 3
Jennings "Tyson" Godsy
May 6, 2004

1. **Criterion - Reading Achievement Substantially Below Chronological Age, Intelligence, Education**

Mr. Godsy's documentation does not show that his reading achievement is substantially below his chronological age. When age based norms are used to score Mr. Godsy's reading achievement, his reading scores are all greater than the 25th percentile (Table 2). Conventionally, the 16th or 25th percentile is often used as the lower end of the average range, below which impairment is demonstrated. The 16th percentile represents 1 standard deviation below the mean. The 25th percentile is recognized as the more liberal cutoff.

Mr. Godsy documentation does show reading achievement, as measured by an individually administered standardized test of reading accuracy (Word Identification) and reading comprehension (Passage Comprehension), which is substantially below that expected given his measured intelligence. This finding is noted when age-based norms are used for both the WRMT-R and the WAIS-R, WAIS-III (Table 2 & 3). It should be noted that the term "substantially below" is interpreted in this situation as a discrepancy of ≥ one standard deviation (15 standard score points). This is a fairly liberal interpretation of the term "substantial difference," in that many others in the field would require a 1.5 to 2 standard deviation difference to demonstrate a substantial discrepancy. In fact, the DSM-IV states, "*Substantially below is usually defined as a discrepancy of more than 2 standard deviations between achievement and IQ*".

2. **Criterion - Significant Interference With Academic Achievement of Activities of Daily Living**

In criteria two, we are looking for documentation that shows a functional impairment in reading, especially as related to the USMLE and the requested accommodation of extended time. In this context, functional impairment refers to a deficit as demonstrated by below-average performance on measures of reading achievement. As noted in number 1 above, the 25th percentile is often used as the lower end of the average range, below which a functional impairment is demonstrated.

In this particular situation, we are looking for data showing a deficit in reading comprehension and/or reading speed, where Mr. Godsy's performance is at least below the 25th percentile. If other criteria were also met, this would suggest a disability that would require the accommodation of extended time on the USMLE.

Mr. Godsy's school group achievement testing presented in Table 1 shows all reading achievement clearly above the 25th percentile. Similarly, reading achievement as measured in individual psychoeducational assessment shown in Table 3 indicates Mr. Godsy's performance is above the 25th percentile when age-based norms are utilized.

In summary, it does not appear that Mr. Godsy has a functional impairment in reading that would be described as a disability requiring the accommodation of extended time on the USMLE. It is my opinion that a functional impairment must be demonstrated in order to substantiate a disability and provide a rationale for accommodations.

Page 4
Jennings "Tyson" Godsy
May 6, 2004

3.  Criterion—Sensory Deficits

Mr. Godsy's documentation does not indicate any known sensory deficits.  In any case, this criterion is not relevant, as it is my opinion that Mr. Godsy's documentation is not sufficient to substantiate a reading disorder in the first place.

In summary, although Mr. Godsy's achievement, as measured by an individually administered standardized test of reading, is substantially below that expected given his measured intelligence, the disturbance in academic functioning is not felt to significantly interfere with activities of daily living that require these skills.  Even though Mr. Godsy's scores on the Word Identification and the Passage Comprehension subtests from the WRMT-R were significantly below his ability level, they were not substantially below the average person in the population.  Based on the data that I have been provided, I do not feel that Mr. Godsy's disturbance or discrepancy in academic skills could be described as a disability.

## ADDITIONAL EVALUATION:

The issue of additional testing was raised at the time of the hearing in early April.  Certainly it was my opinion then (and now) that additional test data and information was needed before the diagnosis of a learning disorder requiring accommodations on the USMLE could be clearly demonstrated.  The question is whether or not reliable and valid test results could be obtained in further testing.  The validity and reliability of additional testing would be questionable because of possible conscious or unconscious bias in the examinee created by the circumstances.  The USMLE is an extremely high-stakes test that would create a great deal of pressure on any examinee, especially one who has previously been unsuccessful at passing this test.

In addition, through the deliberations carried out thus far, it would be very apparent to Mr. Godsy the type of test results on a measure of reading achievement that would be required to demonstrate a reading disorder.  These tests are very transparent as to the skill or domain that they are measuring.  It is my opinion that this type of information could easily bias any individual's performance on these types of measures.  There already is some question in my mind as to why Mr. Godsy's test performance declined from the 84th percentile on the Passage Comprehension subtest from the WRMT-R administered by Dr. Jacobs in 2002 to the 37th percentile on the same measure administered by Dr. Jacobs in 2004 (see Table 2).  This decline could be due to unusual measurement error, examiner's administration error, or examinee bias.  Of the reading measures administered, the Passage Comprehension subtest would be the most relevant to the requested accommodations on the USMLE.

Page 5
Jennings "Tyson" Godsy
May 6, 2004

## SUMMARY:

Unfortunately, we do not have the most thorough database on which to make a judgment regarding the accuracy of the diagnosis of a reading disorder that would require accommodations on the USMLE. However, there is a wealth of documentation (see Table 1 and 3) that does not clearly support this diagnosis and requested accommodations on the USMLE.

Nancy L. Nussbaum, Ph.D.
Licensed Psychologist
Neuropsychologist

NLN:jw

# Table 1
## Godsy Standardized Test Results in Reading

| Grade | Test | Results |
|---|---|---|
| K | Science Research Associates (SRA) | Composite Reading National Percentile = 80% |
| 1st | Science Research Associates (SRA) | Composite Reading National Percentile = 74% |
| 2nd | Science Research Associates (SRA) | Composite Reading National Percentile = 58% |
| 6th | Science Research Associates (SRA) | Reading Comprehension = 94% |
| 7th | Metropolitan Achievement Tests (MAT)6 | Reading Comprehension 80 Percentile Rank Grade Equivalent =12.1 |
| 7th | Texas Educational Assessment of Minimum Skills (TEAMS) | Scaled Score in Reading = 882 Demonstrated Mastery of Grade 6 Reading Competencies |
| 9th | Metropolitan Achievement Tests (MAT)6 | Reading Comprehension = 99% |

## TABLE 2

### Comparison of WAIS-R and WAIS-III Data

| WAIS | Bridge City WAIS-R 1993 (SS) | Dr Jacobs WAIS-R 2002 (SS) | Dr Trahan WAIS-III 2004 (SS) |
|---|---|---|---|
| Verbal IQ | 119 | 99 | 114 |
| PIQ | 105 | 126 | 114 |
| Full IQ | 114 | 110 | 115 |

## TABLE 3
## Woodcock Johnson Reading Mastery Test Comparison

| Woodcock Johnson Reading Mastery | Dr Jacobs 2002 Standard Score | Dr Jacobs 2002 PR | Dr Trahan 2004 Standard Score | Dr Trahan 2004 PR |
|---|---|---|---|---|
| Word Identification | 93 | 33rd | 93 | 32rd |
| Word Attack | 108 | 71st | 105 | 63rd |
| Word Comprehension | 114 | 66th | N/G | N/A |
| Passage Comprehension | 115 | 84th | 95 | 37th |

# Center For Behavioral Studies
## Donald E. Trahan, Ph.D.

Adult and Child Neuropsychology
Clinical Consultation, Research, Education

3560 Delaware, Suite 105
Beaumont, Texas 77706
(409) 898-8222
Telefax: (409) 898-4946

Diplomate-American Board of
Professional Neuropsychology

FOLLOWUP NEUROPSYCHOLOGICAL REPORT
May 14, 2004

RE:   Jennings Tyson Godsy
      201 Tower Road
      Orange, Texas  77630
      (409)  735-8952
      SSAN:  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

This report is an update to my narrative summary dated February 16, 2004 regarding Jennings Tyson Godsy.  Since that time, I have had the opportunity to review the report prepared for the National Board of Medical Examiners by Dr. Nancy L. Nussbaum.  In this report, Dr. Nussbaum refutes the diagnosis of Learning Disability, even though this diagnosis has been rendered on multiple occasions by various professionals over a period of at least 14 years.  I continue to find it interesting that the only individuals who are refuting this diagnosis are the attorneys for the Medical Board, whose job it is do to so, and a psychologist who, by her own admission, has never even interviewed Mr. Godsy, much less evaluated him.  There are certainly clear limitations in the validity of conclusions drawn from a record review alone, without having the benefit of actually examining a patient. These limitations are explicitly recognized in the ethical guidelines published by the American Psychological Association, as well as specialty guidelines recommended for psychologists performing forensic work.

In reviewing the comments made by Dr. Nussbaum, it is my opinion that she has inaccurately characterized the nature of prior test results.  Specifically, she states that there is little or no evidence to show that Mr. Godsy's academic achievement scores from the past have been "substantially below chronological age, intelligence, or education".  On numerous occasions, she makes reference to the fact that observed scores have not fallen below the 16th or 25th percentiles, standards traditionally used to determine whether scores are considered to be significantly impaired and suggestive of a disability.

A review of available records, which were summarized in my initial report, indicates that Dr. Nussbaum's statements in

EXHIBIT
2

Followup Neuropsychological Report
Jennings Tyson Godsy

this regard are simply not correct.  Initial testing done in
1990 in the Bridge City I.S.D. revealed a WISC-R Full Scale
I.Q. of 114.  However, he exhibited significant deficits on
measures of written expression and spelling.  The spelling
standard score of 71 was 43 points (almost 3 standard
deviations) below his measured level of intellectual
functioning.  The spelling score would fall at approximately
the 3rd Percentile when compared with other children his age.
His Written Expression score was 16 points lower than his
measured level of intellectual functioning, which represents
a difference of a little more than 1 standard deviation.

In April 1993, Mr. Godsy was tested again in the Bridge City
I.S.D., this time, he earned a WAIS-R Full Scale I.Q. of 114.
Achievement test scores from the Woodcock-Johnson revealed
standard scores of 81 in Written Fluency and 72 in Spelling.
The Written Fluency score is 33 points (greater than 2
standard deviations) below his measured level of intellectual
functioning.  The Spelling score was 42 points (almost 3
standard deviations) below his Full Scale I.Q.   On the
Wechsler Individual Achievement Test, a well recognized
measure of academic achievement, he also earned a standard
score of 61 in Spelling.  This score is 53 points (more than
3 standard deviations) below his measured level of
intellectual ability.  All of these scores are considered to
be clearly impaired in comparison with the general
population.  The Woodcock-Johnson Written Fluency score falls
at the 9th percentile and the Spelling score at the 3rd
Percentile.  The WIAT Spelling score was actually below the
1st percentile.

Mr. Godsy was tested again 6 years later in 1999 by Mrs.
Tonya Goldbeck.  At that time, he earned a WAIS-III Full
Scale I.Q. of 111.  Achievement testing revealed a standard
score of 77 in Spelling, which is 34 points (more than 2
standard deviations) lower than his measured level of
intellectual functioning.  This score would fall at the 7th
percentile when compared with the general population.

When I tested Mr. Godsy in February 2004, he earned a WAIS-
III Full Scale I.Q. of 115.  Reading scores from the
Woodcock-Johnson Reading Mastery Test-Revised revealed
standard scores of 89 in Word Identification and Passage
Comprehension.  Both of these scores are 26 points (almost 2
standard deviations) below his measured level of intellectual
functioning.  These scores correspond to the 23rd percentile
of the standardization sample.

Followup Neuropsychological Report
Jennings Tyson Godsy

It is very clear from reviewing these scores that Mr. Godsy's performance on multiple examinations over a period of 14 years not only meet the criteria for "significant discrepancy", but also the criteria for substantial impairment, in that numerous scores have fallen well below the 16th percentile.

Of equal importance is that fact that Dr. Nussbaum's report does not even address the issue of the deficits that Mr. Godsy has shown in the area of reading speed and slowness in information processing. Slowness in reading has been identified as one of the key criteria for diagnosing a reading disorder. Problems with slowness in reading were noted previously by Dr. Claire Jacobs, Ph.D., who evaluated Mr. Godsy in 2002. During my examination, I directly measured rate of information processing using the PASAT. On the PASAT, Mr. Godsy clearly showed deficits in rate of information processing. His standard scores fell within the moderately impaired range, with scores below the 1st percentile on 3 of 4 subtests and at the 5th percentile on the other subtest. He also exhibited considerable slowness on the Woodcock-R Passage Comprehension Subtest, losing credit on 10 items because of taking extended time to provide an answer.

In summary, my opinions regarding Mr. Godsy's learning disability are based upon my examination of him, as well as a review of reports from other clinicians spanning a period of approximately 14 years. Every single one of the clinicians examining Mr. Godsy in the past has diagnosed him with a learning disability. The only person disputing this is Dr. Nussbaum, who has neither interviewed nor evaluated Mr. Godsy. To the extent that Dr. Nussbaum has reviewed records of other professionals, it is my opinion that the data from those clinicians has been inaccurately represented. As noted in previous paragraphs of this report, there are numerous scores reflecting performance in reading, writing, and spelling that is significantly below Mr. Godsy's measured level of intellectual functioning, as well as well below the 16th percentile of the general population. An additional point is that Dr. Nussbaum has never directly addressed the issue of slowness in reading and information processing, which is perhaps the most crucial variable of all. In fact, it is Mr. Godsy's slowness in reading and information processing that more than any other deficit warrants an extension of the time allowance on the USMLE-Step 1 Test. This accommodation is both reasonable and appropriate given the documented deficit.

Followup Neuropsychological Report
Jennings Tyson Godsy

If you have additional questions regarding my findings
and recommendations, please feel free to contact me.

*Donald E. Trahan*

Donald E. Trahan, Ph.D, ABPN
Clinical Neuropsychologist



**The University of Texas**
**Health Science Center at San Antonio**
Mail Code 7790
7703 Floyd Curl Drive
San Antonio, Texas 78229-3900

Medical School
Associate Dean for Student Affairs

(210) 567-4429
FAX: (210) 567-6962

June 9, 2004

Mr. Kenneth W. Lewis
Bush, Lewis & Roebuck, PC
1240 Orleans Street
Beaumont, Texas  77701-3612

RE:     Godsy, J. Tyson, MS III

Dear Mr. Lewis:

The policy of the Medical School of The University of Texas Health Science Center at San Antonio (UTHSCSA) relating to the United States Medical Licensing Examination (USMLE) may be found on page 170 of the *UTHSCSA Catalog 2003-2005* (available online at http://studentservices.uthscsa.edu/publications/Catalog03-05.pdf).

The policy is as follows:

"**UNITED STATES MEDICAL LICENSING EXAMINATION (USMLE)**

Medical students must pass the Step I examination of the United States Medical Licensing Examination (USMLE) in order to be promoted into the Senior year.  All students must have taken the Step I examination in order to begin their clinical clerkships of the Junior year.  Those who are unsuccessful will be allowed to complete the Junior clerkships.  Those students will not be allowed, however, to begin either Senior Electives or Senior Selectives until they have again sat for that examination.  Three (3) failures of the Step I examination will result in dismissal from the Medical School.  Medical students must take the Step II examination of the USMLE in order to qualify for graduation from the Medical School.  The Step III examination will be taken following medical graduation at a time determined by a state Board of Medical Examiners."

**EXHIBIT**

**3**

RE:  Godsy, J. Tyson, MS III
June 9, 2004
Page 2

As you are aware, some medical schools do not require passage of the licensing examination as condition for graduation.  This medical school has had the policy of USMLE passing for several years.  There is not, however, a stated time limit which the task must be completed.  We have tried to be quite flexible.

Hopefully this information will be of assistance to you.  If you require additional information, please contact this office.

Sincerely,

Leonard E. Lawrence, M.D.
Associate Dean for Student Affairs
Professor of Psychiatry, Pediatrics
    and Family and Community Medicine

LEL/bk

# Medical School

## Mission

The mission of the UTHSCSA Medical School is to serve the needs of the citizens of Texas by providing medical education and training to medical students and physicians at all career levels, with special commitment to the preparation of physicians for careers in the practice of primary health care; by conducting biomedical and other health-related research; by delivering exemplary quality health care; and by providing a responsive resource in health-related affairs for the nation and the state, with particular emphasis on South Texas.

## Accreditation

The Medical School is fully-accredited by the Liaison Committee on Medical Education, the body recognized by the U.S. Department of Education for accreditation of programs of medical education leading to the M.D. degree in the United States.

## Admission and Application

Information about specific admission requirements are detailed in the *Applicant Viewbook* of the Medical School. Applicants must have at least 90 semester hour credits from a United States or Canadian college or university with no grade lower than a C in required course work. Applicants must take the Medical College Admissions Test (MCAT) no later than August of the year preceding anticipated matriculation and direct that scores be sent to The University of Texas Medical and Dental Application Center in Austin which is also the source of application forms.

## Acceptance Considerations

Candidates for admission are evaluated not only on the basis of their academic background and preparation for medical school, but also for integrity, maturity, motivation, judgment, and resourcefulness. The Committee on Admissions evaluates each candidate's application to make an assessment of the individual's academic background, performance on the Medical College Admission Test (MCAT), the recommendation of the premedical advisor, and the person's nonacademic achievements. Further evaluation of the most promising candidates is made by means of personal interviews, invitations for which are issued by the Committee on Admissions.

The same criteria for evaluation are applied to all candidates, and no distinctions are made in favor of or against any applicant based on age, race, or sex. Although certain disabilities or combination of disabilities might prevent a candidate from meeting required technical standards, this institution is committed to avoiding discrimination against an otherwise qualified individual with disabilities.

The Medical School will announce its initial acceptances on January 15. Afterwards, acceptances will continue from a list of alternates until all positions in the class are filled. Candidates whose applications are rejected by the Committee on Admissions with or without personal interviews shall be notified as soon as possible after the committee's action.

An applicant receiving an acceptance of admission will be requested to file a letter of intent to enroll within two weeks of receipt of acceptance. The professional schools of The University of Texas System reserve the right to withdraw offers of acceptance to individuals who hold places in the entering classes of more than one professional school for longer than three weeks without previous justification by the applicant and consent by the schools involved.

Because some of the medical schools in Texas begin their academic year earlier than September, all LCME-accredited medical schools in Texas have agreed not to offer acceptances to candidates already enrolled at another medical school in the state after July 1.

## Advanced Standing

The acceptance of students with advanced standing is dependent upon the availability of clinical and academic facilities. Each year the Medical School considers class size and the imperative of maintaining high quality training in deciding whether additional students with advanced standing will be admitted. In such rare cases, only students currently enrolled in a LCME accredited medical school in good academic standing can be considered. Given the scarcity of spaces, preference is given to those who must move to San Antonio for reasons of personal hardship and who have not only the consent but also the active support of their schools for the proposed move. The Medical School in San Antonio will determine in each case the viability of the proposed transfer from an academic viewpoint and establish the necessary courses and other requirements and level at which the transfer would take place. Advanced standing applications are not considered from graduate students or dental students except for a special program which is available for selected candidates who have the D.D.S. degree and are enrolled in the oral surgery postgraduate training program at this and affiliated institutions. In this case, advanced-standing students may be accepted with credit given for basic science courses completed during dental training.

No nonresident of the State of Texas may be enrolled with advanced standing if the result of that enrollment would increase to greater than ten percent the percentage of nonresidents enrolled in the class of which the student would be a member.

Application forms and inquiries concerning advanced standing admission should be obtained from and addressed to the Office of Admissions of the Medical School.



## Scholarships

Limited scholarship assistance is available within the Medical School. General scholarships are initially awarded based on a student's admission ranking as determined by the Admissions Committee following a review of all admission criteria factors. For those scholarships which are donor-designated, selection is based on criteria established by the donor. Application is unnecessary for either category. Scholarships may be renewable depending upon academic performance and/or conditions stated by donors.

## Faculty Advisors

Each student will be assigned a faculty advisor upon matriculation. Advisors have been selected who have an interest in assisting students with various issues that the student encounters and in directing the student to avenues of opportunity. The Faculty Advisor Program is under the direction of the Associate Dean for Student Affairs. Details of the Faculty Advisor Program are provided during Orientation Week.

## Absence, Dismissal, and Readmission

Short leaves of absence may be granted by the Associate Dean for Student Affairs in the case of illness or personal emergency with the understanding that the student arrange with the faculty to make up all work which is missed. Absence for any cause shall, however, be reported by the student, within one week of the student's return, to the Associate Dean for Student Affairs who will determine if the absence was "excused."

Students taking leave from the Medical School without notice or failing to report to the Registrar after leave of absence automatically terminate their enrollment at the Medical School.

In addition, students who fail to register and pay tuition and fees within the specified dates will be considered to have terminated their connection with the Medical School unless permission to register and pay tuition at a later date has been expressly granted by the Registrar.

If requested in writing by the student, a leave of absence for an extended period of time may be granted by the Dean if such absence is considered to be in the best interests of the student. To reach this decision, the Dean will often rely not only on the student's expressed wishes, but also on the opinion of her or his faculty advisor, faculty promotions committees, or other individuals familiar with the circumstances of the case. Generally, an extended leave of absence will not be granted to any student prior to the completion of at least one year of medical school, and while the exact length of the leave of absence will vary in each case, it shall, under no circumstances, exceed one year.

Students who have ceased to be enrolled in the Medical School for any reason (withdrawal, dismissal, failure to register, failure to return from leave of absence at the specified time, or leaving school without authorization) and who wish to be considered for readmission either as freshmen or with advanced standing must apply to the Committee on Admissions. Only students returning on schedule from authorized leaves of absence will be re-enrolled without having to be readmitted.

## Grades, Promotion, and Graduation

The Medical School faculty is responsible for determining a student's fitness to be a doctor of medicine. Committees on promotion for the preclinical and clinical years of the curriculum assess the achievements and progress of each student and make recommendations for promotion, graduation, academic warning, probation, dismissal, or implementation of special academic programs. These recommendations are submitted to the Dean.

The academic standards for successful completion of each course are determined by the department or task force under which the course is administered.

### Grades

Each course in the Medical School curriculum is graded with one of the following grades: A is given for outstanding performance; B, for very good performance; C, for acceptable performance; and I (incomplete) in those cases in which the faculty has authorized the student to delay completion of the course. A grade of D is indicative of a minimum passing performance. Grades of F indicate a failing performance.

It is the prerogative of the director or directors of each course to decide the performance required in examinations or other academic work to merit each of these grades. There is no fixed percentage of the class to which a given grade is limited or to whom a given grade must be applied.

### Promotion

For purposes of promotion, a numerical grade point average is determined for each student at the end of each academic year. The grade point average is calculated by multiplying the numerical equivalent of each grade by the number of semester hours in each course, divided by the total number of semester hours for that academic year (not including those of courses for which an incomplete grade was issued). The values assigned to grades for this purpose are:

A = 4 points
B = 3 points
C = 2 points
D = 1 point
F = 0 points

Normal progression through the Medical School curriculum requires that a student achieve a grade point average of

at least 2.0 in each academic year and that there be no F or I grades that have not been corrected. Achievement of such standard in each academic year is required for promotion to the next academic year. This same standard must be achieved in the senior year for eligibility for graduation.

Individuals who do not meet the standards specified above for promotion to either the second or third year, but whose grade point average in their last academic year is at least 1.5, will be given an opportunity to meet those standards during the summer, either by means of re-examination or completion of other academic requirements as specified by the course directors. If the student successfully completes the requirements set forth, he or she will be promoted to the next academic year. Unsuccessful students will find it necessary to complete an additional academic year during which courses are repeated as needed to meet the standards for promotion.

Individuals who do not meet the standards for promotion to the second or third year and whose grade point average in the last academic year is less than 1.5 but more than 1.0 will not be allowed to attempt to meet the standards for promotion during the summer. Such students will be required to add one additional year to their medical education during which they will repeat whatever courses are necessary in order to meet the standards for promotion.

For the purposes of promotion under the conditions described above, the grade point average of a given academic year will be recomputed either at the end of the summer or at the end of the repeated year, and only the most recent grade will be used for each course. The necessary grade point average for promotion is therefore achieved by substituting grades rather than by adding new grades to the existing ones. All courses graded with D, F, or I must be included in the attempt to improve the grade point average, either during the summer or during an additional academic year.

A student may also elect to attempt improvement in other courses. If the necessary grade point average of 2.0 has been initially achieved and promotion was prevented by only F and I grades, only those courses graded F or I need be included in either the summer re-examinations or the additional year. Registration for the second or third academic years is held only once each year; therefore, students who are unable or ineligible to remove deficiencies during the summer must necessarily add an entire year to their medical education, even though they may take only a few courses during the additional year.

Individuals with a grade point average of at least 2.0 but with Fs at the conclusion of the junior year will have an opportunity to remove deficiencies at the end of the junior year. The junior year will not be considered complete until all Is have been replaced by a grade. Because of the nature of the clinical rotations, it will be necessary for each department to determine whether re-examination would be appropriate as a means of removal of the deficiency or if repetition of clinical work might be required.

In either case, the amount of time allowed for preparation for re-examination or for repetition cannot exceed the length of the original rotation which was failed, and such repetition will count simultaneously as fulfillment of senior year requirements.

Individuals who complete the junior year with a grade point average of less than 2.0 but above 1.0 will be required to remediate the deficiencies incurred during clinical clerkships. The remediation activity will include all clerkships in which grades of D and F were received. In each case the Clerkship Director will determine the method through which the required remediations will occur. In those instances in which the remediation requirement is repetition of the disciplinary Part II examination of the National Board of Medical Examiners, a three-week period of academic preparation is mandated to occur prior to examination administration. For those students for whom repetition of clinical clerkships is the required method, the repeat clerkship period may not exceed the length of the original clerkship in which the deficiency was initially incurred.

The remediating activity described above will occur at the beginning of what ordinarily would be the Senior year. The time necessary for remediation activities will be taken from the eight-week vacation which ordinarily accrues for Senior students. In those instances where the length of remediation exceeds eight weeks, the student will be delayed in graduation.

The Clinical Promotions Committee and Pre-Clinical Promotions Committee are considering revisions to the promotion guidelines. The guidelines stated above are subject to modification within the matriculation period of current and future students.

## United States Medical Licensing Examination (USMLE)

The United States Medical Licensing Examination (USMLE) now represents the single pathway to medical licensure in the United States. This is a three-step examination process. The Step I examination must be taken by all students at the end of the Sophomore year. Students must achieve a passing score on Step I of the USMLE in order to be promoted to the Senior year of Medical School. A maximum of three (3) attempts is allowed to fulfill this requirement. The Step II examination will be taken the Senior year. Students are required to take Step II prior to graduation, but the outcome of the exam is not used for promotion decisions. The Step III examination will be taken following Medical School graduation at a time determined by the State Board of Medical Examiners.

## Academic Probation

Students who are not promoted in the routine manner from one year to the next will be considered to be on academic probation and will remain on probation until they meet the requirements for promotion.

## Academic Dismissal

It is intended that no more than two (2) years should be allowed for the completion of any one academic year nor more than six (6) years for the completion of requirements for graduation (exclusive of a leave of absence), and that any one course or junior or senior rotation not be repeated more than once to remove an F grade. Therefore, dismissal from the Medical School for academic reasons will be considered for:

(1) Students who are unable to meet the standards for promotion to a given academic year or the standards for eligibility for graduation after one additional year during which courses were repeated in an effort to meet those standards;

(2) Students who would require repetition of courses or rotations after they have previously used a total of two additional years in order to meet the standards for promotion in previous academic years;

(3) Students who receive a grade of F in a course or rotation being repeated.

(4) Students who are unable to achieve a passing score on Step I of the USMLE examination within three attempts.

(5) Students whose overall grade point average in any of the academic years is 1.0 or less.

Dismissal for academic reasons will be subject to review by the appropriate Promotions Committee. The recommendations of the Promotions Committees are to the Dean. The students may appeal the recommendations of the Promotions Committee and the decision of the Dean to the Faculty Council. The decision of the Faculty Council is final with regard to academic matters. A further appeal may be made by the student to the President of UTHSCSA but only on issues of procedural irregularity.

## Graduation

The degree of Doctor of Medicine is awarded by the Board of Regents upon the student's successful completion of the prescribed curriculum, recommendation of the Faculty of Medicine to the Dean, and certification by the Dean to the President. Candidates must (1) be at least 18 years of age at the time the degree is awarded; (2) present evidence of good moral character; (3) offer evidence of having satisfactorily fulfilled all academic requirements of the medical curriculum; and (4) comply with all necessary legal and financial requirements.

Degrees will be conferred once a year on Commencement Day in the Spring. Students who complete requirements for a degree earlier in the year will be conferred the degree on the following Commencement Day, but may request the Registrar to provide a Certification of Completion on the date of graduation.

## Honors

Alpha Omega Alpha (AOA) is a national society organized for the promotion of scholarship and research in medical schools, the encouragement of high standards of character and conduct among medical students and graduates, and the recognition of high attainment in medical science practice and related fields by alumni and faculty. Election, which is based upon academic excellence achieved in all required courses of the curriculum, is limited to no more than one-sixth of the total number of graduates.

## Student Organizations

Descriptions of the Medical School organizations as well as those of all registered UTHSCSA student groups are in the *Student Guide*.

## Curricular Design

The four-year medical curriculum is designed to provide a core of scientific knowledge and clinical skills that should enable successful students to progress to the necessary postgraduate training which ultimately enables a physician to care for patients. In addition to specific knowledge, the school offers an environment in which students can develop a professional and ethical attitude, and a sense of responsibility for patients that characterize the true physician. Each course, including electives and selectives, has been deemed essential in providing the training and experience that every physician must have.

### First Year

The first four weeks of the first-year curriculum concentrate on learning introductory skills of patient interaction, history taking, and physical diagnosis. As students then begin the basic science courses, the clinical skills are integrated and students experience the direct application of basic science knowledge to patient care.

* Clinical Integration
* Biochemistry
* Microscopic Anatomy
* Gross Anatomy & Embryology
* Microbiology
* Neuroscience
* Physiology

### Second Year

The second year builds on knowledge gained in the first year. Disease processes are taught in organ system modules with an integration of clinical sciences, pathology, pharmacology, and clinical skills.

* Advanced Clinical Examination Skills
* Introduction to the Clinical Sciences
* Pathology
* Pharmacology
* Behavioral Science
* Psychopathology