IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION



| | | |
|---|---|---|
| JENNINGS TYSON GODSY, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | NO. 1:04-CV-00053 |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | § § § | |
| Defendant. | § § | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO SUPPLEMENT RECORD FOR PRELIMINARY INJUNCTION AND MOTION TO STRIKE DR. TRAHAN'S MAY 14, 2004 REPORT AND UTHSCSA JUNE 9, 2004 LETTER**

TO THE HONORABLE U. S. DISTRICT JUDGE:

COMES NOW defendant, National Board of Medical Examiners, and would respectfully show unto the Court as follows:

**I.**

**IT IS UNFAIR TO DEFENDANT FOR PLAINTIFF TO CONTINUE TO SHIFT THE EVIDENTIARY RECORD IN THIS MATTER**

At the request of the Court, following the April 8, 2004 hearing, the parties agreed that defendant's expert, Dr. Nussbaum, would have the opportunity to review testing data generated by plaintiff's most recent expert, Dr. Trahan, that Dr. Trahan had failed to bring with him to the preliminary injunction hearing. On April 8, 2004, before he departed the courthouse, Dr. Trahan was asked to provide all remaining data generated in connection with his testing of the plaintiff to plaintiff's counsel for immediate provision

to the defendant. The information was not produced to defendant's counsel until April 16, 2004. (*See*, Exhibit No. 1, a true and correct copy of the cover letter identifying information produced on that date.) While Defendant had believed that all records of Dr. Trahan's testing were included in the original request, Dr. Trahan did not produce the answer sheets. Defendant requested the omitted records, and those were produced on April 23, 2004. (*See*, Exhibit No. 2, a true and correct copy of the cover letter from plaintiff's counsel.) Thereafter, Dr. Nussbaum reviewed that data, as well as additional data produced from Claire Jacobs' files, and produced a report addressing that data. Dr. Nussbaum's supplemental report purposely did not readdress issues already covered in her initial report.

Defendant could not and should not be expected to continue to respond to evidence when plaintiff attempts to continue to expand and modify the evidentiary record. As stated at the April hearing, it is defendant's position that the only record which should be considered by the Court is the evidence provided by the plaintiff to the Board in 2002. Plaintiff's cannot use Dr. Nussbaum's attempt to comply with the Court's request as a springboard for unlimited supplementation of the factual record.

## II.

At no time did defendant agree to, nor expect any resumption of an evidentiary hearing until defendant's counsel was informed by the Court around the time of the (subsequently cancelled) June 8, 2004 management conference that plaintiff had requested an additional hearing. Defendant's expectation was that if the additional materials produced by plaintiff's experts did not change the opinions previously

BEAULITIGATION:640411.1                         2

expressed by Dr. Nussbaum at the April 8 hearing, that the Court would proceed to render its ruling based on the evidence presented by the parties at that time.

### III.

The April 8, 2004 hearing was set at the request of plaintiff. Plaintiff bore the burden of proof upon all issues presented for resolution at that hearing. The law does not permit plaintiff the luxury of continuing to supplement the evidence to be considered by the Court, which is exactly what the plaintiff is attempting to do by tendering the supplemental report of Dr. Trahan, as well as a hearsay letter from Leonard E. Lawrence, M.D., the Associate Dean for Student Affairs at the University of Texas Health Science Center at San Antonio.

If plaintiff desired to present evidence from any representatives of the medical school or present the opinions of Dr. Trahan which were presented in his May 14, 2004 report, then plaintiff should have elicited those opinions at the April 8, 2004 hearing. The Court granted neither Dr. Trahan, nor plaintiff the latitude to respond to any supplemental opinions offered by Dr. Nussbaum.

Dr. Nussbaum met the request of the Court by evaluating testing data unavailable to her - - but which was well known to Dr. Trahan - - at the April 8 hearing and has explained to the Court the basis for her conclusions. Only Dr. Nussbaum's May 6, 2004 report should be received into the evidentiary record, as it was generated at the request of the Court.

### IV.

Defendant reurges its objection to any consideration of the opinions of Dr. Trahan

which are based on evaluations conducted or data generated after plaintiff's 2002 submission of information to defendant. The crux of this entire case is an alleged violation of the Americans With Disabilities Act ("ADA") which plaintiff asserts occurred in **2002**. Plaintiff has not asserted any violation of the act occurring after he made his initial application to take the Step 1 examination with accommodations.

As defendant pointed out at the April 8 hearing, Dr. Trahan's 2004 assessment of the plaintiff is irrelevant to the legal issue of whether defendant violated the ADA in 2002 when it rejected the plaintiff's one and only application to take the Step 1 examination with accommodations. In essence, the plaintiff is attempting to prove a violation of the statute with proof that was not in the record considered by the defendant in 2002 and which was not even created until 2004, after suit had already been filed.

Defendant maintains that the only information which the Court should be considering in determining whether the defendant violated the ADA is the evidence that was provided to the defendant in **2002**.

## V.

## DR. NUSSBAUM'S ROLE

Plaintiff and plaintiff's expert, Dr. Trahan, both unfairly attack Dr. Nussbaum and demonstrate a total lack of understanding of Dr. Nussbaum's role in this dispute.

The critical issue in this case is whether the information submitted by plaintiff in 2002 demonstrated existence of a disability entitling him to the requested accommodations. Dr. Nussbaum was asked to review those materials and render an opinion regarding whether the information provided by plaintiff in 2002 demonstrated

existence of such a disability. She was not requested to, nor has she attempted to, render a diagnosis.

Dr. Nussbaum reviewed the data generated by Dr. Trahan at the request of the Court to respond to the Court's question about whether that data, if subject to consideration from a legal standpoint, would make a difference in her opinion. It did not and, consequently, defendant submitted her report to the Court to notify the Court that the inquiry requested by the Court had been concluded and that Dr. Nussbaum's opinions had not changed.

At the hearing, Dr. Trahan, who clearly has taken on an adversarial role in advocating plaintiff's position, should have confined his opinions to the same issue Dr. Nussbaum (and Dr. Bernier) did: Whether the record submitted by plaintiff in 2002 established the existence of a disability entitling plaintiff to the accommodations requested? Dr. Trahan's opinion that plaintiff has a disability in reading, in contrast, relies on the results of tests he administered in 2004 which had not previously been conducted or which, in the case of the Woodcock Reading Mastery test, had not shown any significant deficit (plaintiff having scored in the 87th percentile in 2002).

## VI.

## ATTEMPTED IMPROPER USE OF "JUDICIAL NOTICE"

Plaintiff cites no authority for his request that the Court take "judicial notice" of the letter from Associate Dean Lawrence and Dr. Trahan's supplemental May 14, 2004 report. Federal Rule of Evidence 201 allows the courts to take judicial notice only of

"adjudicative facts." Fed. R. Evid. 201(a). Plaintiff's proffer fails to meet the mandatory requirements of Rule 201:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201(b) In the event that the Court considers taking judicial notice of the reports of either Dr. Trahan or Associate Dean Lawrence, then defendant requests an opportunity to be heard in dispute of that request pursuant to Fed. R. Evid. 201(e)

By asking the Court to take judicial notice of the reports, the plaintiff is, in effect, asking the Court to rule dispositively that the statements set forth in those reports are true and correct when they are, to a large extent, assertions which are being disputed by the parties in the hearings before the Court. Indeed, statements in the reports are at variance with assertions made by plaintiff in his complaint. Certainly, the Court is not in a position to take judicial notice of facts upon which the defendant has not even had the opportunity to cross-examine and which have been presented to the Court only in unsworn, unverified letters. The purpose of judicial notice is merely to eliminate the need for proof of facts upon which there is no real controversy. With respect to the assertions set forth in these reports, there is unquestionably live controversy.

## VII.

### PLAINTIFF'S ATTEMPTED INTRODUCTION OF THE LETTER FROM THE ASSOCIATE DEAN AND EXCERPTS OF THE MEDICAL SCHOOL CATALOG

Plaintiff's Original Complaint claimed that the defendant had a rule that prohibited

him from taking the test more than three times. (*See*, Orig. Cpl. at § 1, pp. 1-2) Defendant has never had that rule and made that point at the April 8 hearing. Now, plaintiff has changed his argument to claim that the defendant is challenging the existence of the medical school's rule, which was not the issue addressed by defendant at the hearing. (*See*, Hearing Transcript, p. 25, ll. 7-18) Both the letter and the catalog could have been produced at the April 8 hearing if plaintiff desired to present that evidence to the Court, as both were certainly available to plaintiff had he requested them from the school.

Allowing this proffered information into the record now means that the defendant has no opportunity to cross-examine regarding the unsworn information provided in the Associate Dean's letter. If the Court is going to allow testimony from a representative of the school relating to the school's policies and procedures and any efforts to or grounds for accommodating the plaintiff, that information should have been provided in the form of live testimony subject to cross-examination or, alternatively, through a deposition in which the defendant had the right of cross-examination.

Further, Associate Dean Lawrence's letter does not support plaintiff's claims of "urgency." At this time, plaintiff has allowed the start of the school year to pass by. According to the online school catalogue, school terms begin in June. Thus, plaintiff cannot begin his fourth year of medical school until June 2005, which is well after the January trial setting to which he has agreed. According to his own testimony, he cannot apply for residencies until he begins his fourth year. (*See*, Hearing Transcript, p. 19, ll. 22-25)

## VIII.

## PLAINTIFF'S ATTEMPTED INTRODUCTION OF DR. TRAHAN'S "VOLUNTEERED" SUPPLEMENTAL MAY 14, 2004 REPORT

The Court did not request supplemental information from Dr. Trahan, other than requesting that Dr. Trahan provide Dr. Nussbaum with all of the data that he developed when he evaluated plaintiff in February 2004, but which he had failed to bring to the April 8, 2004 hearing - - thus preventing cross-examination based on that data and preventing Dr. Nussbaum from addressing that data in her own testimony at that time.

If plaintiff had additional information plaintiff wished to elicit from Dr. Trahan, it was incumbent on plaintiff to ensure that Dr. Trahan was fully questioned and that Dr. Trahan brought all of his data with him to the hearing. By now attempting to supplement the record with the May 14, 2004 report, the plaintiff seeks to present additional information to the court which is offered as "evidence," but is unsworn and which is not subject to cross-examination.

The court did not hold the April 8 hearing open for presentation of "any and all" kinds of evidence. The court merely asked that Dr. Nussbaum review Dr. Trahan's additional data, once he produced it, and notify the court whether that data changed her opinions. The court also thereafter facilitated the release of the underlying testing data generated by Dr. Jacobs in 2002 by order dated April 15, 2004. Other than that, the record was closed.

## IX.

## PLAINTIFF'S ARGUMENTS ARE REPLETE WITH MISCHARACTERIZATIONS OF THE FACTUAL RECORD AND THE APPLICABLE LAW

Plaintiff's recitation of the factual record is incorrect in numerous respects. Defendant brings the following examples to the attention of the Court:

**Page 1, § 1**: Plaintiff fails to acknowledge that his reading skills were at or above average during the time period addressed.

**Page 1, § 1**: There is nothing in the record to substantiate plaintiff's assertion that his parents and teachers had noted significant difficulties with spelling, written expression, or reading comprehension before the tenth grade. To the contrary, the records that have been provided by plaintiff demonstrate average to above average reading skills. The BCISD assessment was conducted during plaintiff's 10th grade year. At that time, no deficits in reading were identified.

**Page 1, § 1**: Plaintiff claims, without any support in the record, that his parents and teachers had noted some deficits in reading comprehension, but the initial evaluation conducted by the BCISD in 10th grade showed his basic reading skills to be average and at the 10th grade level and that his reading comprehension level was above average, at the 12th grade level.

**Page 2, subsection (a)**: There is no record of a 1993 TASS test school in the record for plaintiff.

**Page 2, subsections (b) - (e)**: Provision of accommodations in one context by one entity establishes no legal entitlement to receive accommodations in a different

context from a different entity. As explained in Defendant's Memorandum of Law: Americans With Disabilities Act, the Court must look at each individual in each situation in determining whether accommodations are legally required.

**Page 3, § 2**: As pointed out above, plaintiff misunderstands Dr. Nussbaum's role in this matter. Neither Dr. Nussbaum, nor Dr. Bernier has attempted or been instructed to render a diagnosis for the plaintiff. Rather, their role was to review the materials submitted by plaintiff in 2002 in support of his request for accommodations for the purpose of determining whether the data was sufficient to demonstrate the existence of the disability claimed. Further, contrary to plaintiff's representations, it is the court, not Dr. Nussbaum, who suggested that the underlying data be produced. Dr. Nussbaum proceeded with rendering her opinion in her report dated March 21, 2004 based upon the 2002 record created by plaintiff himself, as she was entitled to do.

It is the Court, not Dr. Nussbaum, which suggested production of the additional data to satisfy itself as to whether review of any of Dr. Trahan's underlying data would make a difference in Dr. Nussbaum's opinions. It has not.

**Page 5, mid-page unindented paragraph**: Plaintiff inexplicably claims that the criteria of the DSM-IV have nothing to do with the analysis of whether an individual has a disability protected by the ADA. The ADA states that the claimant must have a physical or mental impairment. Accordingly, it is necessary to look to the diagnostic criteria to determine whether such an impairment exists. The ADA itself does not spell out the criteria for deafness, blindness, or other forms of potential impairment. The accepted professional criteria for diagnosis of mental impairment, such as that claimed by

the plaintiff, is the DSM-IV. Professionals evaluating individuals using the criteria in the DSM-IV look at the data resulting or derived from the conduct of evaluations. This analysis results from the DSM-IV application, not from the ADA.

Without any authority whatsoever, plaintiff claims "Under the ADA, the term disabled is applied to anyone who is below the 50th percentile when compared to the population at large." There is absolutely no support for this in the law or in the record in this case and, moreover, if plaintiff's assertion were true, that would mean that 50% of the population is disabled.

**Page 6, quote from DSM-IV "Introduction"**: The caveat in the quoted language is consistent with defendant's position in this case; the ADA requires not only a disability, but evidence that the extent of the limitation caused by the impairment in terms of that individual's own experience is substantial. Notably, it is plaintiff who has repeatedly claimed that the mere diagnosis of a "learning disability" *ipso facto* entitles him to the requested accommodations, while plaintiff has failed to present evidence that any impairments he might have either qualify as a protected ADA disability when he is -- in accord with ADA requirements, compared with the remainder of the general population or (b) that any areas in which he has a genuine learning disability as defined by the ADA entitle him to the accommodations sought.[1].

**Page 6, ¶ following quote from DSM-IV "Introduction"**: As stated above, the existence of a physical or mental impairment is a threshold requirement for eligibility

---

[1] For example, even if plaintiff demonstrated a "disability" in spelling or written expression, that would not entitle him to double time because Step 1 requires no spelling and no written expression.

under the ADA, and the criteria in the DSM-IV is the gold standard for determining whether a mental impairment exists under the ADA. If the courts do not give weight to the DSM-IV criteria, then this negates the ability to arrive at a diagnosis of mental impairment.

**Page 7, first sentence:** Dr. Nussbaum does characterize plaintiff's "disturbances"; she states that they do not rise to the level of a "functional impairment." Without functional impairment, there can be no disability.

**Page 7, § 7:** Dr. Nussbaum's conclusion that "there is a wealth of documentation that does not clearly support this diagnosis and requested accommodations on the USMLE" is supported by the fact that he plaintiff has had five evaluations thus far, and the evidence corroborating an impairment is simply not there.

**Page 7, § 7:** At the bottom of this page, plaintiff attempts to make much of a typographical error in Dr. Nussbaum's supplemental May 10, 2004 report in which Dr. Nussbaum inadvertently referred to a 2004 evaluation by Dr. Jacobs, when she intended to refer to the 2004 report by Dr. Trahan. In fact, Dr. Nussbaum had caught this error and had prepared an explanatory note. This note was mailed to plaintiff's counsel on June 14, 2004 and the green card receipt demonstrates that the corrected report was received by the office's of plaintiff's counsel on June 15, 2004, the day plaintiff's motion was filed with the Court. (*See*, Exhibit No. 3 to this response, a true and correct copy of the green card receipt, letter to plaintiff's counsel, and Dr. Nussbaum's corrective report.)

**Page 8, ¶ 8:** Contrary to plaintiff's assertion, Dr. Jacobs did not find a deficit in plaintiff's reading. On Page 3 of her report, Dr. Jacobs informed the defendant, "Overall,

Mr. Godsy's performance on academic achievement fell in the superior range on arithmetic tasks, the **average range of tasks of reading**, with a significantly low score noted on tasks of spelling." This completely contradicts plaintiff's representation that Dr. Jacobs found a deficit in reading.

**Page 8, ¶ 8:** Plaintiff has provided no evidentiary substantiation for the representation that "mild dyslexia" equals a substantial impairment, even if plaintiff had mild dyslexia. There is no testimony or evidence to that effect. (Moreover, there was no diagnosis of mild dyslexia in the record in 2002, the time period dispositive of this case, as the hearing exhibits plainly establish.)

**Page 8, ¶ 8:** With respect to plaintiff's assertion that Dr. Nussbaum fails to address the educational testing performed by Tonya Goldbeck in her supplemental report, the Court must recall that the purpose of Dr. Nussbaum's May 10, 2004 report was to address new issues raised by the belated production of Dr. Trahan's underlying testing data, not to readdress all aspects of Dr. Trahan's February 16, 2004 opinion. In addition, notably, at the conclusion of the April 8, 2004 hearing, the Court asked Dr. Nussbaum to review Dr. Trahan's testing data. The Court did not ask Dr. Nussbaum to review any data prepared by Ms. Goldbeck, and Dr. Nussbaum prepared the May 6, 2004 report specifically to respond to the Court's inquiry.

**Page 9, ¶ 10:** The actions of the Texas public schools in providing accommodations are completely immaterial to the Court's determination in this case. There is no evidence before the Court that the public school system acted based upon the parameters set under the ADA. Plaintiff's counsel even acknowledges that the Texas

public school system addressed plaintiff's claimed problems "before ADA accommodations were even a blip on the radar screen." The purposes and objectives of an educational school system are quite distinct from the purposes and structure of a test designed to evaluate a student's abilities, rather than to educate that student.

**Page 10, second sentence**: Even if it exists, moderately impaired processing ability does not equate to "substantial" impairment.

**Page 10, third sentence**: Dr. Trahan fails to address the fact that, other than himself, no one who has examined the plaintiff has found that the plaintiff had a deficit in reading. Moreover, in this sentence, plaintiff inaccurately lumps together the particular abilities at issue in this case and labels them, in a conglomeration, as a "learning disability diagnosis."

**Page 10, fourth sentence**: Plaintiff relies heavily on the score produced by plaintiff when Dr. Trahan administered the Woodcock-R Passage Comprehension Subtest. However, Dr. Nussbaum questions the validity of that score because it was in the 87th percentile when Dr. Jacobs tested plaintiff, and in the 37th percentile when plaintiff took the test again, after filing suit.

For all of these reasons, even if the Court considers the May 14, 2004 report of Dr. Trahan, that report provides no support for a preliminary injunction.

WHEREFORE, PREMISES CONSIDERED, defendant prays that plaintiff's motion for leave to supplement the record with the letter from Associate Dean Lawrence and Dr. Trahan's May 14, 2004 report be denied in all respects. Defendant also prays for

all further relief to which it is entitled, whether at law or in equity.

> Respectfully submitted,
>
> MEHAFFYWEBER, P.C.
> Attorneys for Defendant
>
> By: /s/ Elizabeth B. Pratt
> ELIZABETH B. PRATT, Of Counsel
> State Bar No. 16239450

Post Office Box 16
Beaumont, Texas 77704
Telephone: 409/835-5011
Telecopier: 409/835-5177

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded via certified mail, return receipt requested, to the following on this the 23 day of July, 2004:

Mr. Kenneth W. Lewis
Mr. Jeffrey Roebuck
Bush, Lewis & Roebuck, P.C.
1240 Orleans Street
Beaumont, Texas 77701

/s/ Elizabeth B. Pratt
ELIZABETH B. PRATT

## Center For Behavioral Studies
### Donald E. Trahan, Ph.D.

Adult and Child Neuropsychology
Clinical Consultation, Research, Education

3560 Delaware, Suite 105
Beaumont, Texas 77706
(409) 898-8222
Telefax: (409) 898-4946

Diplomate-American Board of
Professional Neuropsychology

April 13, 2004

**HAND DELIVERED**

APR 16 2004

Mr. Ken W. Lewis
Attorney at law
1240 Orleans
Beaumont, TX 77701

**MEHAFFY & WEBER
Beaumont, Texas**

Dear Mr. Lewis:

I am providing copies of the raw scores and data for the testing that was performed on Jennings Tyson Godsy. All raw data have now been provided. Actual answer sheets for the WAIS-III, Woodcock-R, and language battery have not been included because they were not requested. Let me know if additional informatioin is required.

Donald E. Trahan, Ph.D., ABPN
Clinical Neuropsychologist

APR 16 2004


DEFENDANT'S EXHIBIT 1

**Kenneth W. (Ken) Lewis**

Board Certified
*Personal Injury Trial Law*
Texas Board of Legal Specialization

*Civil Trial Advocate*
National Board of Trial Advocacy

**Legal Assistants**
Melanie Lindsey, CLAS
Carla Weighmann, CLAS



**BUSH, LEWIS & ROEBUCK, P.C.**

*Attorneys at Law*

W. Don Bush
Kenneth W. Lewis
Thomas P. Roebuck, Jr.
Brett S. Thomas

Christopher S. Smith
Jeffrey T. Roebuck

John Cash Smith
of Counsel

April 23, 2004

VIA HAND DELIVERY

Elizabeth B. Pratt
Mehaffy Weber, P.C.
2615 Calder
Beaumont, TX 77702

Re:  1:04CV-0053; Jennings Tyson Godsy vs. National Board of Medical Examiners; In the U.S. District Court for the Eastern District of Texas, Beaumont Division

Dear Ms. Pratt

Enclosed are the additional records we received from Dr. Trahan (22 pages) and the records we received from Dr. Jacobs (46 pages).

Sincerely,

*Ken Lewis*

Kenneth W. Lewis

KWL/cpw
Enclosure



Bush, Lewis & Roebuck, P.C.
1240 Orleans • Beaumont, Texas 77701
(409) 835-3521 • (409) 838-HELP • Fax (409) 835-4194



DEFENDANT'S EXHIBIT 2

# MEHAFFYWEBER

ELIZABETH B. PRATT
SHAREHOLDER
BOARD CERTIFIED
LABOR AND EMPLOYMENT LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
elizabethpratt@mehaffyweber.com

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

2615 CALDER AVENUE
POST OFFICE BOX 16
BEAUMONT, TEXAS 77704
TELEPHONE (409) 835-5011
FAX (409) 835-5177
(409) 835-5729

ONE ALLEN CENTER
500 DALLAS, SUITE 1200
HOUSTON, TEXAS 77002
TELEPHONE (713) 655-1200
FAX (713) 655-0222

June 14, 2004

**RE:** Civil Action No. 1:04CV-0053; *Jennings Tyson Godsy v. National Board Of Medical Examiners* (M&W File No. 8425-0001)

Mr. Kenneth W. Lewis
Bush, Lewis & Roebuck, P.C.
1240 Orleans Street
Beaumont, Texas 77701

**VIA CM/RRR NO. 7160 3901 9842 6519 8867**

Dear Ken:

In supplementation of defendant's disclosure, I enclose a copy of a May 24, 2004 letter from Nancy L. Nussbaum, Ph.D. This document bears Bates No. 251 and is provided in supplementation of defendant's disclosure in this cause.

Should you have any questions, please call.

Sincerely yours,

Elizabeth B. Pratt
For the Firm

EBP/htr
Enclosure(s)

BEAULITIGATION:636247.1


DEFENDANT'S EXHIBIT 3

**2. Article Number**

7160 3901 9842 6519 8867

**3. Service Type** CERTIFIED MAIL

**4.** Restricted Delivery? *(Extra Fee)* ☐ Yes

**1. Article Addressed to:**

Mr. Kenneth Lewis
Bush, Lewis, & Roebuck, P.C.
1240 Orleans Street
Beaumont, Texas 77701

COMPLETE THIS SECTION ON DELIVERY

**A.** Received by (Please Print Clearly)

**B.** Date of Delivery: 6-15-04

**C.** Signature: X  BUSH, LEWIS & ROEBUCK, P.C.
☐ Agent
☐ Addressee

**D.** Is delivery address different from item 1? ☐ Yes  ☐ No

PS Form 3811, January 2003      Domestic Return Receipt

EBP (60156 8425-1)

---

**US Postal Service**
**Certified Mail Receipt**
*Domestic Mail Only; No Insurance Coverage Provided*

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

7160 3901 9842 6519 8867

**Sent To:**
Mr. Kenneth Lewis
Bush, Lewis, & Roebuck, P.C.
1240 Orleans Street
Beaumont, Texas 77701

PS Form 3800, January 2003     US Postal Service     **Certified Mail Receipt**   2

EBP (60156 8425-1)

# AUSTIN NEUROLOGICAL CLINIC FOUNDED 1970

OFFICE: 711 WEST 38TH STREET, BLDG. F., AUSTIN, TEXAS 78705 (512) 458-6121
MAILING: P.O. BOX 300669, AUSTIN, TEXAS 78703
FAX: (512) 452-5567 BUSINESS
FAX: (512) 452-9171 HEALTH CARE

NEUROLOGY
J. DOUGLAS HUDSON, M.D.
ALBERT B. HORN, III, M.D.
MICHAL A. DOUGLAS, M.D.
MICHAEL G. HUMMER, M.D.
DAVID W. MORLEDGE, M.D.
KENT T. ELLINGTON, M.D.

ASSOCIATE
NANCY CHILDS, M.D.

NEUROPSYCHOLOGY
DAVID R. STEINMAN, Ph.D.
NANCY L. NUSSBAUM, Ph.D.
DAVID M. TUCKER, Ph.D.
MELISSA R. BUNNER, Ph.D.

ADMINISTRATOR
MARCENA SORRELS

May 24, 2004

Ms. Suzanne Williams
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

RE: Mr. Jennings "Tyson" Godsy

Dear Ms. Williams:

In reviewing my report dated May 6, 2004, I noted an error on page 4 that I would like to correct. In the last paragraph on page 4, it states, "There already is some question in my mind as to why Mr. Godsy's test performance declined from the 84th percentile on the Passage Comprehension subtest from the WRMT-R administered by Dr. Jacobs in 2002 to the 37th percentile on the same measure administered by Dr. Jacobs in 2004 (see Table 2)." This sentence should read, "There already is some question in my mind as to why Mr. Godsy's test performance declined from the 84th percentile on the Passage Comprehension subtest from the WRMT-R administered by Dr. Jacobs in 2002 to the 37th percentile on the same measure administered by **Dr. Trahan** in 2004 (see Table 2)."

I apologize for this error and hope that it does not create a problem for you or for the Judge reviewing this case.

Sincerely,

Nancy L. Nussbaum, Ph.D.
Licensed Psychologist
Neuropsychologist